Carolyn B. HARRIS, Personal Representative of the Estate of Derrick D. Harris

v.

DISTRICT OF COLUMBIA, et al., Dennis J. Beemer, Sgt., 4th District, D.C. Metropolitan Police Department, Christopher Viamonte, Richard A. Gaskins, and Alan E. Lucas, Appellants.

No. 90–5281.

United States Court of Appeals, District of Columbia Circuit.

Argued March 5, 1991.

Decided May 10, 1991.

Edward E. Schwab, Asst. Corp. Counsel, Office of the Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Office of the Corp. Counsel, were on the brief, for appellants. Donna M. Murasky, Washington, D.C., Atty., Office of the Corp. Counsel, also entered an appearance for appellants.

W. Scott Funger, of the Bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of the court, for appellee.

Before SILBERMAN, BUCKLEY and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge HENDERSON.

SILBERMAN, Circuit Judge:

Dennis Beemer, Christopher Viamonte, Richard Gaskins, and Alan Lucas, members of the District of Columbia Metropolitan Police Department, appeal the district court's denial of their motion for summary judgment in a case brought by the estate of Derrick Harris, who died of a drug overdose while in appellants' custody. Harris claims that appellants violated his constitutional rights by denying him necessary medical care; he seeks recovery for wrongful death. We hold that the officers are shielded from liability by qualified immunity and therefore reverse the district court's decision.

I.

The facts (construed most favorably to Harris) are as follows. Sometime after 10:00 p.m. on February 22, 1987, Harris arrived at a Washington, D.C. nightclub. He began sweating profusely, rolling on the floor, and screaming that he did not want to die. An employee of the club flagged down Officer Viamonte and informed him that Harris was inside, was "freaking out" on PCP (a drug—also known as "angel dust"—that typically produces violent reactions), and that an ambulance had been called. Viamonte attempted to talk to Harris but Harris did not respond, instead continuing to flail around violently and to rant and rave. Viamonte, concluding that Harris was on PCP, called his dispatcher for a police wagon at 10:21 p.m. His experience with people intoxicated with PCP led him to believe that the sooner they are put in restraints in a wagon, the safer it is for everyone involved.

Officer Gaskins and Sergeant Beemer arrived with a police wagon. Harris was still flailing uncontrollably and required several people to hold him down. The officers therefore shackled his ankles, handcuffed him, and locked him in the van. Harris was crying that he could not breathe and continued to scream that he did not want to die. Beemer concluded that Harris should be taken to the Emergency Psychiatric Response Division (EPRD) of D.C. General Hospital for mental observation. But Viamonte requested that they first bring Harris back to the police station so that he could fill out the forms necessary to send Harris to the EPRD, and so that an officer on the next shift could take Harris there because his shift was ending. Beemer and Gaskins agreed; this detour caused a short delay (the officers were at the station only 7 minutes).

Viamonte filled out the necessary form and gave it to Gaskins at 10:45 p.m. Gaskins reviewed the form and ordered Officer Lucas to take Harris to the EPRD. Lucas, driving through a foot of snow, arrived at the EPRD at 11:25 p.m.; Harris was still kicking and screaming in the back of the van. Nevertheless, the physician at the EPRD refused to admit, treat, or even to look at Harris because Viamonte had not filled out the form completely.[1]

Lucas stated in his deposition that he went back to the van to radio the station for further instructions and opened the rear door to check on Harris. Harris apparently attempted to escape and attacked Lucas. The two fought; Harris went limp and started breathing very deeply. Shortly thereafter, however, Harris assaulted Lucas again; they struggled, and Harris bumped his head audibly on the top of the wagon. Lucas continued to try to get Harris back into the wagon so he could close the door. During this struggle, Harris slid face down into the back of the wagon and began moaning and breathing heavily. Lucas attempted to move Harris into a different position so he could breathe more easily and then banged on the door of the EPRD. When no one answered, he ran back to the wagon, where Harris did not seem to be breathing. Lucas felt for a pulse, did not find one, and thought Harris was dead. He attempted to radio the station again.

At 11:46 p.m., moments later, another sergeant arrived and instructed Lucas to take Harris to the emergency room a short distance away. At this point, Harris breathed again and began shaking. They arrived at the emergency room at 11:50 p.m. Harris was pronounced dead from an overdose of PCP at 12:20 p.m.

Harris' estate then filed this action for damages alleging that appellants had violated Harris' rights under the due process clause of the Fourteenth Amendment and appending several D.C. law tort claims. Appellants moved for summary judgment on the grounds that under the facts alleged by Harris they had committed no constitutional tort and that they in any event were immune from suit (qualified immunity).

The district court denied the motion. The court first held that, because appellants took Harris into custody and restrained his movements, they were obligated as a matter of due process not to be "deliberately indifferent" to his medical needs. *See Memorandum Opinion, Harris v. District of Columbia,* No. 88–0555, at 8–12, 1990 WL 235706 (June 15, 1990) (*"Mem. Op."*). This obligation, according to the court, was clearly established and appellants were therefore not entitled to qualified immunity. *See id.* at 17–19. The court then concluded that there was enough evidence from which a reasonable jury could find that all appellants were deliberately indifferent to Harris' condition. The district judge pointed to the officers' determination to wait for the next shift to take Harris to the hospital, their decision to bring him to the EPRD instead of to the emergency room, Officer Viamonte's neglect in not filling out the form completely, and Officer Lucas' failure to take Harris immediately to the emergency room after Harris bumped his head in the van. *See id.* at 14–17, 18–19. Even though none of the appellants were responsible for all four of these decisions, the district court made no attempt to sort out their individual culpability. As this is an interlocutory appeal, appellants may now challenge only the holding with respect to qualified immunity. *See Mitchell v. Forsyth,* 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–18, 86 L.Ed.2d 411 (1985) (qualified immunity determinations turning upon questions of law are immediately appealable).[2]

1. Viamonte had written in "John Doe" on the line designated for the name of the person applying for medical care on behalf of the individual in custody; he had not checked the box indicating that he is a D.C. police officer or given his rank; he did not complete the portion for Harris' name, address, and age; and he did not fill out the sections requesting the facts which led him to believe that Harris was mentally ill and a threat to himself and/or others.

2. We therefore do not decide whether the record creates a triable issue of "deliberate indifference." We are quite doubtful, however, that the evidence shows more than some degree of negligence, which may not violate the due

## II.

Qualified immunity shields government officials performing discretionary functions from damages actions stemming from certain allegedly unconstitutional conduct in order that they not be unduly inhibited in or diverted from the exercise of their duties by fears of personal monetary liability and harassing litigation. The doctrine is designed to avoid such disruption (and the social cost it entails) by "provid[ing] government officials with the ability 'reasonably to anticipate when their conduct may give rise to liability for damages,'" *Anderson v. Creighton,* 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (citation omitted), and by "'permit[ting] the resolution of many insubstantial claims on summary judgment.'" *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

Officials are liable for committing constitutional torts, accordingly, only if they knew, or were unreasonable in not knowing, that their behavior violated the Constitution. *See, e.g., Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable ... generally turns on the 'objective legal reasonableness' of [his] action") (quoting *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738); *see also Martin v. Malhoyt,* 830 F.2d 237, 253–54 (D.C.Cir.1987) (summary judgment must be granted unless "the unlawfulness of defendant's action was so 'apparent,' that no reasonable officer could have believed in the lawfulness of his actions") (citation omitted). This focus on objective factors— reasonable knowledge of the law—affords a guidepost to officials and allows the immunity determination to be made without need for a potentially disruptive factual inquiry into an official's subjective good faith.

Reasonable knowledge of the law means, of course, knowledge of present constitu-

tional law. Because "an official [cannot] reasonably be expected to anticipate subsequent legal developments, nor [can] he fairly be said to 'know' that the law forb[ids] conduct not previously identified as unlawful," reasonable knowledge of the law involves knowledge only of legal rules that were "clearly established" at the time of the conduct at issue. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. An official is, thus, entitled to summary judgment unless "[t]he contours of the right [were] sufficiently clear that a reasonable official would [have] underst[ood] that what he [was] doing violate[d] that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. We believe that the district court misapplied this principle in denying appellants' motion for summary judgment.

Harris asserts, and the district court perceived, a clear obligation on the officers to provide Harris with medical treatment under the due process clause. But there is little on the face of the clause to alert officials to possible constitutional liability for the acts at issue here. The clause is phrased in the negative—"[n]o State shall deprive any person"—and does not easily admit of a construction imposing on government officials the duty affirmatively to do anything. Whether this negative language gives rise to "positive" rights such as the one asserted by Harris is currently the subject of substantial theoretical interest and the law in the area is far from settled. *See generally Archie v. City of Racine,* 847 F.2d 1211, 1213, 1218–23 (7th Cir.1988) (*en banc*) (discussing various theories). Indeed, one of the few clear rules in this context is that government officials are under no constitutional obligation to protect or to provide medical services to the general public, even if they know of a particular person's need and regardless of whether that obligation is imposed by state tort law, unless the government has entered into "certain special relationships" with the person. *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S.

process clause, *see Daniels v. Williams,* 474 U.S. 327, 332–34 & n. 3, 106 S.Ct. 662, 665–66 & n. 3, 88 L.Ed.2d 662 (1986) (holding that negligence

does not violate the due process clause but reserving the question whether gross negligence does).

189, 109 S.Ct. 998, 1004, 1006–07, 103 L.Ed.2d 249 (1989).

The district court nevertheless construed four cases—*Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); and *DeShaney*—as firmly establishing the proposition that appellants did enter into the requisite special relationship with Harris and that they therefore had a due process obligation to attend to his medical needs. In *Estelle*, the Supreme Court held that the cruel and unusual punishment clause of the Eighth Amendment obliges the state to provide some medical care to prison inmates. *See* 429 U.S. at 104, 97 S.Ct. at 291. *Youngberg* extended this obligation as a matter of substantive due process to involuntarily committed mental patients (to whom the cruel and unusual punishment clause does not apply), reasoning that "[i]f it is cruel and unusual punishment to ... [deny all medical care] to convicted criminals ..., it must be unconstitutional to ... [do the same to] the involuntarily committed—who may not be punished at all...." *See* 457 U.S. at 315–16, 102 S.Ct. at 2458. *Revere* involved a logical application of the duty recognized in *Youngberg:* that the due process clause similarly requires the government to provide medical care to persons who have been injured while being apprehended by the police. *See* 463 U.S. at 244, 103 S.Ct. at 2983. And *DeShaney* summed this line of authority as recognizing a special relationship between the state and a person giving rise to a constitutional duty on the state to assume some responsibility for the person's medical needs only "when the State takes a person into its custody and holds him there against his will." 109 S.Ct. at 1005. The rationale for this principle is that

when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action set by the Eighth

Amendment and the Due Process Clause. The affirmative duty to protect arises *not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.* In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf ... which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means.

109 S.Ct. at 1005–06 (emphasis added and citations omitted).

We do not agree with the district court that a constitutional duty to obtain medical assistance for Harris follows ineluctably either from these cases or from the rationale expressed in *DeShaney*. Harris had not been formally committed, either by conviction, involuntary commitment, or arrest, to the charge of the District; therefore, unlike *Estelle*, *Youngberg*, and *Revere*, the government had not entered into a special relationship with Harris prior to discovering him intoxicated on PCP. The special relationship here, if any, then had to be created by the very act of the officers in picking up Harris in response to his pleas for help. Harris' inability to take care of himself, moreover, was not due to anything the officers did but was instead a direct result of his ingestion of PCP. To be sure, as the district court stressed, the police officers took Harris into their "custody" and restrained his movements *after* he was already incapacitated. But any affirmative constitutional duty on the District officials to look after his medical needs would then have to arise not as in the cases relied on by the district court "from the limitation which [they] ... imposed on [Harris'] freedom to act on his own behalf," *DeShaney*, 109 S.Ct. at 1006, but from the limitation which they imposed (by locking him in the police van) on the possibility of *others* learning of Harris' condition and coming to his aid. Under the district court's reason-

ing, then, ambulance drivers are subject to a constitutional obligation every time they pick up a patient.

The basis of the district court's ruling is thus not, as in the *Estelle–Youngberg* line, that the state has a constitutional duty to provide some medical care to someone whom it has already formally committed to its custody and deprived of liberty but that the state assumes that duty by the very act of making initial efforts to help someone seeking assistance who by reason of his own actions is unable to help himself. This *reduces* to an implicit constitutionalization of the general tort law principle that although no one has an obligation to rescue a person in need, if they attempt a rescue they assume a duty to perform it well, for in attempting the rescue they are reducing the chance that a more skilled individual might come to the person's aid, *see generally* Restatement (2d) of Torts § 324.

This is quite a different proposition from that adopted in *Estelle, Youngberg, Revere,* and *DeShaney.* It is not, in the first place, grounded nearly so well in the language of the due process clause—it is no longer the "deprivation of liberty" which causes the injury, as was deemed crucial in *DeShaney* to trigger due process protections, so much as the "deprivation of visibility" or the appearance of helplessness. And it is rather difficult to envision how policemen, ambulance drivers, or other government employees would behave if constitutional liability were to attach to efforts to help those who were injured or incapacitated.[3] Admittedly, one can imagine rather horrible examples, of let us say, a policeman or ambulance driver picking up an automobile accident victim and letting him bleed to death while the driver stopped for coffee. But not all torts committed by government officials are constitutional torts, *see, e.g., DeShaney,* 109 S.Ct. at 1006–07, and we are not at all confident that it will be subsequently determined by the Supreme Court (or other federal courts) that the *Youngberg* line will be extended to this kind of situation.

Whatever the ultimate resolution of this question, the district court's side of it cannot in any sense be said to be clearly established. The district court was able to cite only Justice Brennan's *dissent* in *DeShaney* and a single case from the District Court for the Eastern District of Pennsylvania (*Baldi v. City of Philadelphia,* 609 F.Supp. 162 (1985)) to support the notion that a government employee's attempt at assistance which might lessen the availability of other sources of rescue itself creates a constitutional duty, *see Mem.Op.* at 11–12 and n. 10, and counsel for Harris was unable to add to the list. Given the uncertainty of the legal basis for implying affirmative governmental obligations from the due process clause, the reasons to distinguish the duty relied on by Harris from that established in the *Estelle–Youngberg* line, and the paucity of caselaw adopting the district court's view, the unconstitutionality of appellants' actions was hardly "apparent," and they are consequently entitled to qualified immunity. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

None of this means, as our concurring colleague contends, that we have intimated how we would ultimately determine the question on the merits. We have pointed out distinctions between the *Estelle–Youngberg* line and this case only because we may not extend qualified immunity to these officers unless we see an analytical difference between those circumstances in which a constitutional duty has been held to apply and the facts presented here. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (rejecting the notion that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful"). Our colleague concurs because "the facts of [the previous] cases are ... sufficiently different from the circumstances here that Harris cannot be said to have enjoyed a 'clearly established' constitutional right to medical care." Concurring op. at 1. Yet it would appear that she does not regard those factual differences as making an analytical difference. This seems like having

---

3. State tort liability may of course bear on offi- cials' incentives as well.

one's constitutional cake and eating it too—it may well be that it is unfair to hold police officers to the same standard as judges in assessing whether *factual* differences matter, but that is the notion of qualified immunity adopted by the Supreme Court in *Anderson.* *See also Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39 ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent official should know the law governing his conduct.").[4]

\* \* \* \* \* \*

We hold that appellants were not under a clearly established constitutional obligation to obtain medical care for Harris and that they are consequently entitled to summary judgment on grounds of qualified immunity. Accordingly, the district court's denial of their motion for summary judgment is

*Reversed.*

HENDERSON, Circuit Judge, concurring:

I concur in the majority's conclusion that the appellants enjoy qualified immunity because at the time of Harris's death there was no clearly established constitutional right to medical care for someone who, like Harris, is taken into police custody for the purpose of obtaining medical care rather than for any law enforcement purpose. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). In a series of decisions, the Supreme Court has found citizens in state custody constitutionally entitled to some degree of medical care during imprisonment, *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), pretrial detention, *Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), and commitment to state mental institutions, *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The facts of those cases are, however, as the majority observes, sufficiently different from the circumstances here that Harris cannot be said to have enjoyed a "clearly established" constitutional right to medical care. I also concur in the majority's judgment because the appellants are entitled to qualified immunity on the additional ground that, even if the claimed right was clearly established, the facts developed below, and summarized by the majority, do not make out a violation of that right. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.... Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts."). In short, I find the appellants entitled to judgment as a matter of law based on qualified immunity because "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. Nevertheless, I write separately to disassociate myself from what I perceive as the majority's strong intimation that, based on the distinctions between the facts here and those in *Estelle, Youngberg* and *Revere,* a citizen like Harris, who is unable to care for him-

---

**4.** The concurrence also affords qualified immunity "on the additional ground that, even if the right was clearly established, the facts ... do not make out a violation of that right." Concurring op. at 16. But that position seems to combine the immunity issue—whether it was clearly established that the Constitution forbade the officers from being deliberately indifferent to Harris' medical needs—with the merits issue—not before us—whether the officers were actually deliberately indifferent. The latter question, no matter how close, cannot be grounds for

qualified immunity (though if there were no evidence of deliberate indifference, the officers would of course be entitled to summary judgment in the general Rule 56 sense, as there would be no issue of material fact). Qualified immunity insulates officials from liability when a *legal question* governing their conduct is unclear, not when a jury question concerning that conduct is close. *See, e.g., Anderson,* 483 U.S. at 638–41, 107 S.Ct. at 3038–40; *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815; *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39.

self and who is taken into custody by the state for his own welfare, in fact enjoys no due process right to medical care. *See* Maj.Op. at 13–16. In my view those differences, while supporting a finding of qualified immunity here, do not compel the conclusion that the right does not exist.[1]

In holding that the eighth amendment gives rise to a right to medical care for convicted prisoners, the Supreme Court reasoned: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290. The same justification can support finding a constitutional right to medical care where, as here, a person is taken into custody for his own welfare even if, left on his own, he would be unable to provide care for himself. In fact, that was precisely the case in *Youngberg* in which the severely retarded plaintiff[2] was committed to a state institution at the instigation of his mother who felt she could not provide adequate care. Under those circumstances, the *Youngberg* Court concluded that the son "enjoy[ed] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." 457 U.S. at 324, 102 S.Ct. at 2462. Nor is the existence of a constitutional right to care here foreclosed, as the majority suggests,[3] by the Supreme Court's recent opinion in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which refused to impose on the state a constitutional duty to protect an abused child from harm which "did not occur while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." *Id.* at 201, 109 S.Ct. at 1006. The *DeShaney* Court reasoned:

> While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them. That the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the guarantor of an individual's safety by having once offered him shelter.

*Id.* at 200, 109 S.Ct. at 1005. The same reasoning does not necessarily apply where, as here, the individual is rendered more vulnerable because he is in state custody and cut off from other sources of succor.[4] In fact, the *DeShaney* Court expressly declined to address the situation in which a child is harmed while in the custody and care of the state.[5]

---

**1.** That police officers, who "must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office," *Scheuer v. Rhodes*, 416 U.S. 232, 246, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974); *see also Davis v. Scherer*, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984), could reasonably rely on those distinctions does not mean that they will necessarily be found material by a court called upon to decide whether the claimed right exists. The question of the right's existence, however, is not now before this court and I express no opinion on it. In light of our ruling that the appellants are entitled to qualified immunity, such speculation is unnecessary, *see Osabutey v. Welch*, 857 F.2d 220, 224 (4th Cir.1988); *Walentas v. Lipper*, 862 F.2d 414, 421 (2d Cir.1988), *cert. denied*, 490 U.S. 1021, 109 S.Ct. 1747, 104 L.Ed.2d 183 (1989), and, given the longstanding rule against deciding unnecessary constitutional issues, *see Webster v. Reproductive Health Servs.*, 492 U.S. 490, 525, 109

S.Ct. 3040, 3060, 106 L.Ed.2d 410, 441 (1989) (O'Connor, J., concurring), perhaps improper.

**2.** The plaintiff in *Youngberg* was a 33–year old man who was unable to talk and had the mental capacity of an 18–month–old child and an I.Q. between 8 and 10. 457 U.S. at 309, 102 S.Ct. at 2454.

**3.** *See* Maj.Op. at 14.

**4.** According to a nightclub employee, an ambulance had been called for Harris before he was taken into police custody. Maj.Op. at 11.

**5.** The Court noted: "Had the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9.

For these reasons, I concur in the majority's ruling that the appellants are entitled to qualified immunity but do not agree with its implication that under Supreme Court precedent no constitutional right to medical care exists for someone who, like Harris, is taken into custody for his own welfare and is unable to care for himself.