Terry E. BUTERA, Individually and as Personal and Legal Representative of the Estate of Eric Michael Butera Plaintiff,

v.

DISTRICT OF COLUMBIA, et al. Defendants.

No. CIV.A.98–CV–2794 JLG.

United States District Court, District of Columbia.

July 7, 1999.

Peter C. Grenier, James M. Ludwig, Bode & Beckman, LLP, Washington, DC, for Plaintiff.

Thomas L. Koger, Christine C. Gallagher, Office of Corp. Counsel, Washington, DC, for Defendants.

## *MEMORANDUM*

JUNE L. GREEN, District Judge.

Before the Court is Plaintiff's Motion for Partial Summary Judgment and Defendant District of Columbia's separate Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment in this wrongful death and deprivation of civil rights action. For the reasons that follow, Plaintiff's motion is denied and Defendants' motion and cross-motion are also denied.

## BACKGROUND

This is a civil action for deprivation of substantive due process brought pursuant

to 42 U.S.C. § 1983 (1994) against Defendants District of Columbia and individual employees of the Metropolitan Police Department. In addition, the suit includes claims brought pursuant to the District of Columbia's Wrongful Death Act, D.C.Code § 16–2702 (1997 & Supp.1999) and the Survival Act, D.C.Code § 12–101 (1995 & Supp.1999), as well as common law negligence claims. Discovery has concluded, and these motions are ripe for disposition.

The following are material facts, some of which are disputed. During the period of July 1, 1997 through December 31, 1997, the individual Defendants, Detectives Patterson and Brigidini, Sargeant Breul, and Lieutenant McAllister, were employed by the Metropolitan Police Department ("MPD"). On or about November 13, 1997, decedent Eric Michael Butera (Plaintiff's son) telephoned the MPD to report that he had overheard, on more than one occasion, someone mentioning the highly publicized triple homicide at the Starbucks Coffee Shop in upper Georgetown, which had occurred earlier that July. Mr. Butera had overheard this information first on July 8, 1997 while in the process of purchasing and/or using narcotics at 1015 Delaware Avenue, S.W. and then again approximately a week later at the same address. In addition, Mr. Butera advised the MPD that he had also seen various kinds of firearms at that address. Mr. Butera admitted that he had been going to 1015 Delaware Avenue for many years to purchase and use narcotics.

Mr. Butera was subsequently asked by the MPD to come in, and after looking at mug shots, affirmatively identified the man who he had overheard talking about the Starbucks murders. In order for the investigation to proceed and to pursue evidence of probable cause to search for weapons used at the Starbucks shooting, the MPD decided to arrange a pre-planned drug purchase targeted at 1015 Delaware Avenue, in which Mr. Butera agreed voluntarily to participate undercover. Mr. Butera had no pending criminal charges against him in the District of Columbia nor did he seek or receive any benefit or recompense from the MPD in exchange for the information provided about 1015 Delaware Avenue. Defendants, aware before the pre-planned drug purchase that criminal activity involving drug use was ongoing at the targeted address, assured Mr. Butera that the MPD "would exercise proper care to ensure that he would not be harmed" and that it would "carefully watch and monitor [Mr. Butera] throughout the process." Defs'. Resp. Pl's. First Req. Admis. ¶¶ 80–81. Defendant officers also provided Mr. Butera with information as to the risks involved in the operation, although it is disputed whether he was apprised of all the associated risks.

Before the planned buy, Mr. Butera provided the MPD with a detailed description of his normal course for making drug buys at 1015 Delaware Avenue. He explained that he would enter and exit through the rear door and that the drug transactions usually took no more than 10 to 15 minutes. He agreed with the MPD on a pre-arranged rendezvous point to meet after the purchase.

On the evening of December 4, 1997, the MPD escorted Mr. Butera to 1015 Delaware Avenue where Mr. Butera was dropped off by Detective Brigidini. Detective Brigidini then drove away in order to make it appear that everything was normal, to an area that did not have a view of the events surrounding the drug buy. It is disputed whether the detective waited until Mr. Butera arrived at the door of the premises before driving away. See Dep. Tr. Thaddis Liles at 22–25; Tr. IAD Interview Detective Brigidini at 14. Additional police officers participating in the pre-planned drug buy were also parked in a spot that did not provide a view to the events that subsequently transpired. See Defs'. Resp. Pl's. First Req. Admis. ¶ 122.

In the events that followed, Mr. Butera failed to gain entry through the rear door. As he turned to leave, he was approached by three men who forcefully escorted him

to a nearby courtyard, not visible to the waiting officers. There he was robbed, beaten, and "stomped" to death. From where they were, no Defendant was in a position to know whether Mr. Butera was in trouble or to offer assistance during the course of the drug buy. Defendant Sargeant Breul testified that when Mr. Butera failed to appear as scheduled, "I recall rolling down up window and joking with Detective Patterson, I said why don't you roll down the window in case we hear any gun shots or screams." Tr. IAD Interview Sargeant Nicholas Breul at 19. In addition to the inaccessibility of the attending officers, other police officers responsible for the pre-planned drug buy were not present, including Detective Trainum who did not respond to a page regarding the operation because he was asleep with the pager turned off. *See* Defs'. Resp. Pl's.2d Req. Admis. ¶¶ 214–17. As a result, Mr. Butera was left on a sidewalk bleeding, without the knowledge of any of the Defendants. It was more than 20 minutes after Mr. Butera was dropped off that the officers realized that something had gone wrong and investigated. They later discovered Mr. Butera's body, but were unable to revive him. Mr. Butera died as a result of his injuries.

## DISCUSSION

### Summary Judgment Standard

A motion for summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). The Court must view the material presented in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and resolve all doubts as to facts or the existence of facts against the moving party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment will not lie if a reasonable jury could find that the nonmoving party is entitled to a verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Defendants' Motion for Summary Judgment

#### Substantive Due Process

Plaintiff's constitutional claims are brought pursuant to 42 U.S.C. § 1983 on behalf of herself and the estate of her son, the decedent. She claims that the Defendants, acting in their official capacity, deprived her son of his constitutional right to due process of law by failing to protect him from harm during the drug-buy operation.[1]

■ Constitutional claims alleging deprivation of due process are properly analyzed under the Fifth Amendment to the United States Constitution.[2] According to the Supreme Court, the proper analysis is to determine first whether the Plaintiff has alleged a deprivation of a constitutional right, and then decide whether that right was clearly established at the time of the events in question. *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). Accordingly, the Court turns first to the specific right alleged.

1. Plaintiff has abandoned Counts IV and V (negligent training and supervision of the police officers). Those counts, therefore, are dismissed. *See* Pl's. Opp. at 3 n. 3.

2. Although substantive due process claims against state officials are analyzed under the Fourteenth Amendment, the District of Columbia is covered by the identical provisions

of the Fifth Amendment. *See Hairston v. District of Columbia,* 638 F.Supp. 198, 202 n. 4 (D.D.C.1986). Accordingly, the Court grants Plaintiff's Motion for Due Process Claims in Complaint to be Deemed Brought Under Fifth Amendment. Insofar as the analysis is the same under either Amendment, the Court finds no prejudice to the Defendants.

The constitutional right Plaintiff alleges essentially is her son's right to life. Although most such claims arise in the context of an arrest where the person is killed, there is precedent that substantive due process rights protect individuals in situations other than arrest or seizure by a law enforcement official. *See id.* 523 U.S. 833, 118 S.Ct. at 1715 (substantive due process is preserved for "those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement official's arrest.") (citing *Pleasant v. Zamieski,* 895 F.2d 272, 276 n. 2 (6th Cir.), *cert denied,* 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990)). The issue is not whether the decedent had a constitutional right to life; he did.[3] The real question is whether the Defendants can be found to have deprived him of that right without due process of law.

It is well settled that the standard for measuring official conduct against allegations of constitutional due process deprivation is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sacramento,* 523 U.S. 833, 118 S.Ct. at 1717; *see also Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)(forced stomach pumping of suspect sufficient to shock the conscience).

In the Complaint, Plaintiff frames her constitutional allegations in terms of "deliberate indifference" and "reckless and willful" conduct on the part of the Defendants. The Defendants argue that this is insufficient under the *Sacramento* case to prove a due process violation. They argue that Plaintiff must show that the Defen-

dants actually intended to cause harm to the decedent. The Court disagrees.

In the *Sacramento* decision, the Supreme Court stated as a matter of law that high-speed pursuits of suspects by law enforcement officers with no intent to harm do not give rise to liability under substantive due process. *See Sacramento,* 523 U.S. 833, 118 S.Ct. at 1720. The Court determined that the "intent to harm" standard was applicable because, "like prison officials facing a riot," police facing a rapidly evolving and potentially dangerous situation must make quick decisions. *Id.* Those are not the facts here.

The Plaintiff alleges that the officers themselves planned the drug-buy operation in advance and from the safety of their own offices. They were not facing a rapidly evolving situation, and it is disputed whether the drug-buy operation was even necessary to their murder investigation. This is very different from the situation in *Sacramento*.

This case, in fact, is more like those brought by prison inmates for failure to provide for their care and well being. In such situations (where circumstances are not fast moving), the Supreme Court determined that the much lower standard of "deliberate indifference [could] rise to a constitutionally shocking level." *Id.* 523 U.S. 833, 118 S.Ct. at 1719. The Court concludes, as a matter of law, that the proper standard to be applied under the facts of this case is "deliberate indifference."[4] Whether the alleged deliberate indifference of the police officers here was sufficient to "shock the conscience" and thereby offend constitutional guarantees, is a subject upon which reasonable minds

**3.** The Defendants also argue that Ms. Butera (decedent's mother) does not have a separate "constitutionally-protected liberty interest in the companionship and society of her son." Count X, Compl. ¶ 181. The Court disagrees. The D.C. Circuit has itself recognized such a constitutionally protected right. *See Franz v. United States,* 707 F.2d 582, 595 (D.C.Cir.1983)(recognizing the "[constitutional] reciprocal rights of parent and child to one

another's 'companionship.' ") (citing *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

**4.** "Deliberate indifference" is equivalent to "reckless disregard" for purposes of due process analysis. *Sacramento,* 523 U.S. 833, 118 S.Ct. at 1720–21.

could differ and, therefore, is left properly to the jury. *See e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (whether inmate diabetic denied treatment was conscience-shocking was jury question).[5]

### Qualified Immunity

Turning now to whether the constitutional right in question was clearly established, the Court addresses the Defendant police officers' qualified immunity defense.[6]

■ "[G]overnment officials performing discretionary functions generally are ... 'shielded from liability ... insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Clearly established" is defined as a right, the contours of which are sufficiently clear that a reasonable official would understand that his/her conduct violates that right. *Wilson,* 526 U.S. 603, 119 S.Ct. at 1699.

■ Plaintiff alleges that the wrongfulness of Defendants' conduct should have been clear to them especially given the "special relationship" that was created when the decedent voluntarily agreed to assist the officers in their murder investigation. She states that the police officers effectively abandoned her son in a dangerous situation after promising to protect him and then failing even to monitor his movements during the operation. She alleges that the officers' conduct violated the MPD's own General Order governing the use of civilians in police operations, such General Order being sufficient to confer

knowledge of decedent's rights on the Defendants. *See* Pl's. Opp. at 17.

Moreover, there appear to be factual disputes concerning precisely what transpired during the operation. They include such disputes as the location of the waiting Defendant officers, from where the decedent was to emerge after the buy was completed (front or back door of dwelling) and whether decedent was monitored even initially after he was dropped-off. *See id.* at 19–20. The resolution of these factual disputes is important for two reasons: 1) it will determine objectively whether a reasonable officer could have believed such conduct to be lawful, and 2) it can help answer the underlying issue of whether the alleged conduct "shocks the conscience." *See DeGraff v. District of Columbia,* 120 F.3d 298, 302 (D.C.Cir.1997) (existing factual record was insufficient to determine reasonableness of officer's conduct for summary judgment on issue of qualified immunity). Accordingly, the Court finds that the facts in dispute are material and that summary judgment on the constitutional deprivation allegations is not appropriate.

### Assumption of the Risk

The Defendants next seek summary judgment on the basis that the decedent assumed the risk when he agreed to assist the police officers and participate in the drug-buy operation. Defendants state that the decedent was apprised of the risks involved and understood the personal danger to himself, but decided to undertake those risks voluntarily.[7]

■ The affirmative defense commonly referred to as "assumption of the risk"

---

5. There are also material factual disputes with regard to the Defendant officers' conduct that preclude summary judgment. *See infra* p. 11.

6. The qualified immunity defense is only available to the Defendant officers for those counts in which they are sued in their personal capacity (Counts XII–XIV). *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099,

87 L.Ed.2d 114 (1985)(personal immunity defenses unavailable to officials sued in their official capacity).

7. Defendants state that decedent claimed to have been trained in the martial arts and that he had previously fought off attackers in that same location. *See* Defs'. Mot. Summ. J. at 22.

has two essential elements: 1) actual knowledge and comprehension of the potential danger, and 2) voluntary exposure to that danger. *Morrison v. MacNamara,* 407 A.2d 555, 567 (D.C.App.1979). Here, Plaintiff disputes whether decedent had the requisite knowledge. She states that her son was never told that on the preceding night, officers had been called to the subject address on drug trafficking complaints. Nor, she states, was decedent told of the MPD's ongoing investigation into organized crime activity in that neighborhood.[8] It appears entirely plausible to the Court that had the decedent been apprised of these factors, he would not have agreed to cooperate with the police officers in their plan. As a result, the Court cannot say as a matter of law that decedent had knowledge of the risks to himself sufficient to "assume the risk" and, therefore, summary judgment is denied.

### Intentional Infliction of Emotional Distress

Defendants next seek dismissal of Plaintiff's claim for the alleged intentional infliction of emotional distress of her son based on his fatal beating. Defendants state that they cannot be held liable under this claim because they were not the ones who beat the decedent.

 The elements of intentional infliction of emotional distress are: "1) extreme and outrageous conduct on the part of the defendant which 2) intentionally or recklessly 3) causes the plaintiff severe emotional distress." *Howard Univ. v. Best,* 484 A.2d 958, 985 (D.C.App.1984) (citations omitted). If reasonable minds could differ on whether the conduct was extreme and outrageous, then the issue is one for the jury to decide. *See Anderson v. Prease,* 445 A.2d 612, 613 (D.C.App. 1982). Here, the Court has already determined that facts are in dispute concerning the conduct of the Defendant officers on the evening of the drug-buy and summary

judgment therefore is not appropriate. With regard to the "intentional or reckless" element, that also cannot be dismissed as a matter of law. Although meeting that standard is a high hurdle to clear, the Court has already determined above that deliberate indifference may be used to show a due process deprivation under the circumstances of this case. If Plaintiff can make such a showing, the jury can also reasonably find that Defendants were reckless as well. *See Sacramento,* 523 U.S. 833, 118 S.Ct. at 1720–21 (deliberate indifference is equivalent to reckless disregard). The disputed facts, however, must be decided by a jury.

### Punitive Damages

Defendants also seek summary judgment with regard to Plaintiff's request for punitive damages. This, too, will be left to the jury to decide.

 It has been established that under common law and under the pertinent laws of the District of Columbia in particular, a party may seek punitive damages against the District of Columbia where there is a showing of "extraordinary circumstances." *Atchinson v. District of Columbia,* 73 F.3d 418, 425 (D.C.Cir.1996). The precise outline of the "extraordinary circumstances" condition has not been defined. *See Rieser v. District of Columbia,* 563 F.2d 462, 482 (D.C.Cir.1977). However, the Court of Appeals in *Rieser* added peripheral insight to this question: "Punitive damages are generally awardable to punish tortfeasors and deter similar conduct, but only where the defendant's conduct was particularly outrageous, demonstrating reckless disregard for the rights of others. Mere inadvertence or even gross negligence is insufficient." *Id.* at 481 n. 100. There, the Court of Appeals concluded that no reasonable jury could have determined "extraordinary circumstances" or "outrageous" and "reckless" disregard on the

---

**8.** Plaintiff alleges that Reynaldo Mathis, the individual later convicted of murdering decedent was, in fact, a target of that investigation.

facts presented. Similarly, in *Smith v. District of Columbia*, 336 A.2d 831 (D.C.App.1975), the D.C. Court of Appeals concluded that under the specific facts of the case, extraordinary circumstances were found to be absent, and therefore, the District of Columbia was determined to be free from punitive damages. The decision, however, did not conclude that the District of Columbia, or any municipality for that matter, was permanently immune from punitive damages under local and common law.

■ Here, the allegations step beyond the bounds of mere negligence on the part of the District of Columbia, and present circumstances upon which a jury might find the existence of "extraordinary circumstances." They are: (1) The manner in which Mr. Butera was murdered; (2) the time required for the attending officers finally to realize Mr. Butera's location and body; and (3) the comments or jokes made by the officers while attending Mr. Butera's pre-arranged drug purchase. A reasonable juror should be able to make the judgment of whether the evidence shows sufficient gross recklessness and blatant disregard for the well-being of Mr. Butera that would constitute a scenario of "extraordinary circumstances."

For these reasons Defendants' motion for summary judgment on the issue of punitive damages is denied.

### Plaintiff's Motion for Partial Summary Judgment and Defendants' Cross–Motion for Partial Summary Judgment [9]

Plaintiff has requested that this Court grant her partial summary judgment and find that, as a matter of law: (1) Defendants had sufficient probable cause to secure a search warrant for 1015 Delaware Avenue, S.W. based on the disclosures Mr. Butera provided regarding his own crimes; and (2) General Order 308.13 applied to the Metropolitan Police Department oper-

ation in which Mr. Butera was murdered. Reciprocally, by way of cross-motion for partial summary judgment, Defendants affirmatively deny, as a matter of law, the existence of probable cause, as well as the applicability of General Order 308.13 to the operation in which Mr. Butera was murdered. For the foregoing reasons, this Court denies the motion and cross-motion for partial summary judgment as to both issues asserted by Plaintiff and Defendants respectively.

### Probable Cause

■ The determination of probable cause, as a matter of law or fact is a jury question where material facts are in dispute. *See Simmons v. United States*, 206 F.2d 427, 429 n. 7 (D.C.Cir.1953) (distinguishing civil cases which allow the issue of probable cause to be determined by a jury "if, as is true of any other pertinent issue, the facts are in dispute."). *See also Phillips v. Corbin*, 132 F.3d 867, 869 (2d Cir.1998) (concluding that since there was a disputed issue of material fact, the question of probable cause was properly submitted to the jury); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible."). Although the parties are in general agreement that, with regard to this issue, material facts are not in dispute, the Court finds otherwise. Relevant gaps in the record concerning whether there was probable cause to obtain a search warrant foreclose any ruling as a matter of law.

This case revolves around facts which do not fit the usual mold of section 1983 police misconduct cases, in which a civil action is brought as a result of, *inter alia*, a search and/or seizure administered illegally without probable cause. Here, there was no incident of a search or seizure at all, and

---

**9.** It is noteworthy to mention that by filing their Cross–Motion for Partial Summary Judgment on June 23, 1999, Defendants did not comply with this Court's March 11, 1999 Order requiring that all dispositive motions be filed no later than June 10, 1999.

no affidavit or search warrant was issued in this case.

The Fourth Amendment of the United States Constitution requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In clarification of the particularity requirement of the warrant clause, the Supreme Court found that the application for a search warrant must articulate the specific items to be seized that relate to a particular crime. *See Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). The Court bases its conclusion on the primary purpose of the Fourth Amendment, which is to prevent "unreasonable search and seizures." *Id.* at 489, 96 S.Ct. 2737.

Unfortunately, in this case, there is no affidavit or search warrant from which to gauge the reasonable particularity of the items to be searched or seized and the requisite probable cause. Although the motions and record are replete with references to a "search warrant," the precise nature of the warrant or the particular items that would have been searched and seized are not disclosed. *See e.g.,* Tr. IAD Interview Sargeant Nicholas Breul at 4, 6–7. Plaintiff herself does not state what actually would have been sought, except that the police could have applied for a warrant seeking narcotics, firearms (or both), or "information regarding the possible perpetrators of the Starbucks murders." Pl's. Reply at 10. This is guesswork at best. If the warrant specifically sought the recovery of narcotics, there may have been probable cause (based on the ongoing drug activity on the premises); yet, evidence suggests that narcotics alone could not have been the basis of the warrant, given what the officers were really interested in finding. First, the particular individual Defendants were not narcotics officers, but were homicide officers. In fact, the record indicates that at the time of the pre-arranged drug purchase using Mr. Butera, the individual Defendants did not seek the aid or assistance of MPD's narcotics branch. *See* Pl's. Reply at 9. Second, the Defendant officers were interested in the investigation of the Starbucks triple murder case and in the recovery of possible weapons used in the crime as evidence. *See* Tr. IAD Interview Sargeant Nicholas Breul at 4. Certainly, the MPD may have had enough evidence of the crime of possession and distribution of controlled substances to get a warrant to search for narcotics, but that would not have been the target of their search. *See* Dep. Tr. Detective Patterson at 78 ("I could care less about you buying drugs. If you can somehow get this guy's name who made the statement, that's what I'm interested in."). Without illustrating any further, it is irrelevant whether the MPD could have had probable cause for a search warrant for the narcotics. They were searching for evidence of the Starbucks murders and not for drugs. Whether they would have received a warrant to search for both is unclear, given the information they had at the time. The Court, of course, cannot speculate as to what information they may have included in the affidavit in support of the warrant, and cannot therefore conclude that probable cause existed or did not exist.

Plaintiff relies heavily on *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). That case, however, is not on point. In *Harris,* a search warrant was issued on the basis of an actual affidavit submitted by an investigating officer. The affidavit and search warrant authorized governmental agents to search and seize evidence of illicit whiskey upon which federal tax had not been paid. In this respect, *Harris* involves no ambiguity as to what was to be searched and seized and why, and the particular circumstances leading up to the affidavit were addressed by the Court. To the contrary, this case involves no affidavit or search warrant, and the record does not show upon what

basis the MPD might have obtained one.[10] Accordingly, the Court finds the factual record to be insufficient to rule on the probable cause issue one way or the other, and therefore denies both parties' motions on this issue.

### The Issue of General Order 308.13

As to the issue of whether General Order 308.13 applies to the operation in which Mr. Butera was murdered, there is a genuine issue of material fact as to whether the pre-arranged drug buy can be interpreted as a "tactical police operation," as interpreted by Plaintiff, or an "operational plan," as interpreted by Defendants (General Order 308.13 covers only tactical police operations). Plaintiff argues that the testimony of Detectives Patterson and Brown show convincing evidence that the MPD operation involving Mr. Butera was a "tactical police operation." Defendants, however, contend that during the depositions, there was some question as to the manner to which the term "tactical" was referred, and there exists some dispute as to how "tactical" should be defined. It is apparent that both parties differ markedly on the interpretation of deposition and interview testimony with regard to the applicability of the General Order, and more specifically, the meaning of "tactical police operation." *See* Dep. Tr. Detective Johnny Brown at 37–38, 57–59; Dep. Tr. Detective Anthony Patterson at 13–15.

For these reasons, the Court finds that the issue turns on a dispute of material fact, and therefore denies both Plaintiff's Motion and Defendants' Cross–Motion for Partial Summary Judgment on the applicability of General Order 308.13.

10. In addition, Plaintiff's reliance on the fact that the MPD later secured a search warrant on the very basis that Defendants deny as being stale information, is without merit. The affidavit, which was signed December 5, 1997, applied for a search and seizure warrant as a result of the crime of murder of Mr. Butera and not of the information of drug activity supplied by decedent. The affidavit is unmistakable as to the specific items to be seized—pre-recorded MPDC funds, blood, blunt instruments, and other instruments that may possibly be related to the murder. The affidavit did not authorize the search for narcotics or firearms within 1015 Delaware Avenue simply because the crime investigated was for the death of Mr. Butera. Therefore, Plaintiff is in error as to rely on the search warrant affidavit of December 5, 1997.

### CONCLUSION

For the reasons stated, the Court concludes that summary judgment is not warranted given the facts (some of which are disputed) in this case. It must be left to the jury to decide whether the Plaintiff's son was denied due process of law when he was killed assisting the Defendants. The same is true for Plaintiff's claims of intentional infliction of emotional distress, punitive damages and Defendants' assumption of the risk defense. Moreover, the Court is unable to rule, as a matter of law, on the questions of whether the Defendant officers had probable cause to search the premises at 1015 Delaware Avenue and whether they violated MPD General Orde 308.13 (defining use of civilians in tactical police operations) with regard to Mr. Butera. An appropriate Order accompanies this memorandum.

### ORDER

Upon consideration of Plaintiff's Motion for Partial Summary Judgment; Defendants' Cross–Motion for Partial Summary Judgment and separate Motion for Summary Judgment; the oppositions, replies, and supplements thereto; and for the reasons stated in the attached memorandum of law, it is by the Court this 7th day of July 1999,

**ORDERED** that Plaintiff's motion for partial summary judgment and Defendants' Cross–Motion for Partial Summary Judgment are **DENIED** with regard to (1) the question of probable cause for the purpose of a search warrant of 1015 Delaware Avenue and to (2) the issue of the applicability of General Order 308.13 to the

operation in which Mr. Butera was murdered; it is further

**ORDERED** that Defendants' motion for summary judgment is **DENIED**; it is further

**ORDERED** that Plaintiff's Motion for Due Process Claims in Complaint to be Deemed Brought Under Fifth Amendment is **GRANTED**; it is further

**ORDERED** that Counts IV and V of the Complaint (negligent training and supervision) are deemed withdrawn by Plaintiff and therefore are dismissed; and it is further