**Terry E. BUTERA, Individually, and as Personal and Legal Representative of the Estate of Eric Michael Butera, deceased, Appellee,**

v.

**DISTRICT OF COLUMBIA, et al., Appellants.**

No. 00–7008.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 12, 2000.

Decided Jan. 9, 2001.

---

Charles F.C. Ruff argued the cause for appellants. With him on the briefs were Kevin C. Newsom, Robert R. Rigsby, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Donna M. Murasky, Assistant Corporation Counsel.

Daniel A. Rezneck, General Counsel, was on the brief for amicus curiae District of Columbia Financial Responsibility & Management Assistance Authority.

Paul Mogin argued the cause for appellee. On the brief were Brendan V. Sullivan, Jr., John G. Kester, Peter C. Grenier and James M. Ludwig. J. Alan Galbraith entered an appearance.

Before: EDWARDS, Chief Judge, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

This appeal arises from the tragic death of 31–year–old Eric Butera while he served as an undercover operative for the Metropolitan Police Department of the District of Columbia. Mr. Butera's mother, Terry Butera, sued, on her own behalf and on behalf of her son's estate, the District of Columbia and the four police officers who engineered the undercover operation, alleging that they recklessly failed to provide adequate protection for her son. She alleged violations of her son's and her

own civil rights under 42 U.S.C. § 1983 (1994), negligence under the District of Columbia Survival Act, D.C.Code § 12–101 et seq. (1995 Repl.), and the District of Columbia Wrongful Death Act, D.C.Code § 16–2701 et seq. (1997 Repl.), and at common law for intentional infliction of emotional distress. The jury returned verdicts against the officers on the constitutional claims and against the officers and the District of Columbia on the statutory claims, and awarded Terry Butera $70,530,000 in compensatory damages and $27,570,000 in punitive damages.

On appeal, the District of Columbia and the four officers (collectively, "the District of Columbia") contend that the district court erred in denying their motion for judgment as a matter of law under Fed. R.Civ.P. 50, or alternatively for a new trial under Fed.R.Civ.P. 59, or for remittitur. See Butera v. District of Columbia, 83 F.Supp.2d 25 (D.D.C.1999) ("Butera II"). With respect to the civil rights claims, the District of Columbia contends that the officers did not violate either Eric Butera's or Terry Butera's substantive due process rights, because no such rights existed. Alternatively, the District of Columbia contends that the officers are entitled to qualified immunity because, even if Eric and Terry Butera could assert substantive due process rights, it was not clearly established prior to Eric Butera's death that the officers' conduct would violate these rights. In this regard, the appeal presents two questions of first impression in this circuit: (1) whether the District of Columbia can be held constitutionally liable for failing to protect an individual who is not in custody from harm inflicted by a third party, and (2) whether a parent has a constitutionally-protected interest in the society and companionship of her adult son. In addition to challenging the civil rights claims, the District of Columbia disputes the lawfulness of imposing punitive damages against it and the sufficiency of the evidence to support the punitive damages awards against the four officers. Finally, the District of Columbia challenges the sufficiency of the evidence to support the statutory claims, and the denial of its request to substitute an expert witness for a disqualified expert.

We affirm in part and reverse in part. On the civil rights claims, we hold that the "State endangerment" concept, through which Eric Butera might have succeeded in proving a constitutional violation, was not clearly established prior to his death; hence, the officers were entitled to qualified immunity. We also hold that there is no parental due process right to the company of an adult child who is independent; consequently, Terry Butera had no grounds for asserting a constitutional violation. Therefore, the officers were entitled to summary judgment on all claims brought under 42 U.S.C. § 1983. We further hold, consistent with recent precedent in this circuit, that the evidence did not amount to the "extraordinary circumstances" necessary to award punitive damages against the District of Columbia. For these reasons, we vacate the $70 million compensatory award on the civil rights claims and the $27 million punitive damages award against the District of Columbia. In all other respects, we affirm the judgment awarding $530,000 in compensatory damages under the Survival and Wrongful Death Acts, and a total of $570,000 in punitive damages against the four officers.

### I.

*A. Background.* On November 16, 1997, Eric Butera telephoned the Metropolitan Police Department of the District of Columbia ("MPD") to provide information about the highly publicized triple homicide at the Starbucks coffee shop that had occurred July 7, 1997. He told Detective Anthony Patterson, one of the MPD's homicide detectives assigned to the Starbucks investigation, that on two separate occasions, while he was purchasing or using crack cocaine at a house in the Greenleaf Gardens housing complex in Southwest Washington, D.C., he overheard

someone talking about the Starbucks murders. He also said he had seen firearms at the house. Detective Patterson and his partner met with Eric Butera that same day. Both detectives found him to be credible and trustworthy. Eric Butera told Detective Patterson that he had come forward with this information because "he was no longer taking drugs, he was attempting to get his life in order and he wanted to do the right thing." On November 23, 1999, Eric Butera went to the homicide branch and identified from mug shots the person whom he had overheard talking about the Starbucks murders.

In addition to Detective Patterson, Lieutenant Brian McAllister and Sergeant Nicholas Breul were assigned to the Starbucks investigation. To advance the investigation, the officers decided to stage an undercover drug purchase at the house where Eric Butera had overheard the conversation and seen the drugs and firearms. The officers asked Eric Butera to assist them by conducting the undercover drug purchase, and Eric Butera agreed. For purposes of the Butera drug purchase, Lieutenant McAllister supervised the officers, Sergeant Breul was in charge of the operation, and Detective Patterson was the lead detective. They also enlisted the participation of Detective Anthony Brigidini, who was familiar with the Greenleaf housing complex.

On December 4, 1997, officers Patterson, Brigidini, and Breul met with Eric Butera to plan and execute the drug purchase. The officers planned the operation to resemble as closely as possible Eric Butera's previous visits to the Greenleaf Gardens house. Eric Butera told them that usually he would enter and exit through the back door of the house, and that the entire transaction generally took "anywhere from one minute to ten minutes, maybe fifteen minutes." Eric Butera and the officers agreed to follow this same pattern, with one exception: Eric Butera would exit

through the front door and meet the officers at a pre-arranged location. The officers assured Eric Butera that the MPD would "exercise proper care to ensure that he would not be harmed," and that they would "carefully watch and monitor him throughout the process." They supplied him with $80 in marked twenty dollar bills to make the drug purchase.

After the debriefing, the officers decided that Detective Brigidini would drive Eric Butera to the house, and Detective Patterson and Sergeant Breul would follow in a separate car for surveillance and backup. Detective Brigidini drove Eric Butera to the house around 9:20 p.m., and watched as Eric Butera approached the back door. As Eric Butera knocked on the door, Detective Brigidini drove away and parked approximately one hundred fifty feet from the house. Detective Brigidini testified that he was attempting to mirror the practices of those who had driven Eric Butera to the location in the past, by circling the area until Eric Butera emerged from the house to be picked up. Detective Brigidini also intended to place himself in a position where he could see the front of the house (from which he expected Eric Butera to emerge) and the rear opening of the walkway behind the house; from his location, however, he was unable to see the back of the house. Meanwhile, Detective Patterson and Sergeant Breul parked their car, with their windows down, in a location that enabled them to see only part of the back alley of the housing complex.[1] As a result, none of the officers was in a position to see (or otherwise monitor) Eric Butera when he attempted to enter the house.

After approximately fifteen minutes had passed since Eric Butera approached the house, Detective Brigidini, who had not seen Eric Butera, notified Sergeant Breul and Detective Patterson that he was becoming uneasy. Detective Brigidini began driving around the block to look for him, and after circling the streets, he returned

1. At that time, Sergeant Breul joked to Detective Patterson that they should keep the windows down so they could "hear any gunshots or screams."

to his original position. Sergeant Breul and Detective Patterson also began to look for Eric Butera. Approximately thirty minutes after Detective Brigidini dropped off Eric Butera, uniformed police officers from the MPD First District who were unrelated to the Starbucks investigation appeared at the scene; they were responding to a "911" call by a civilian reporting an unconscious person in the rear walkway of the house where Detective Brigidini had left Eric Butera. Detective Brigidini chose to remain inside his car when he saw the uniformed officers, for fear of compromising the operation.

Shortly after seeing the uniformed officers, the detectives heard an MPD First District radio report of a man down in the alley behind the house that Eric Butera attempted to enter. Approximately forty minutes had passed since Detective Brigidini had last seen Eric Butera. Because the officers had left Eric Butera at the rear of the house, they were unaware that he had never gained entry; rather, Eric Butera was accosted by three men, who robbed and stomped him to death in the alley behind the house. Sergeant Breul and Detective Patterson drove to the alley and found a uniformed First District officer standing with a flashlight over Eric Butera, who was bleeding from the back of his head. An ambulance took Eric Butera to George Washington University Hospital, where he was pronounced dead by reason of blunt force trauma to the head; he was 31 years old.

At trial, the parties presented conflicting evidence concerning (1) the purpose of the undercover operation, (2) the manner in which Eric Butera came to participate in the undercover drug buy, (3) the degree to which the officers made Eric Butera aware of the risks involved, and (4) the adequacy of the measures that the officers took to ensure Eric Butera's safety. The District of Columbia made a number of admissions,

which were read to the jury. Terry Butera presented evidence that the officers gave conflicting versions of the purpose of using Eric Butera in this operation: While the District of Columbia admitted that the purpose of the operation was to obtain a search warrant, the individual officers testified that the operation was intended to test Eric Butera's reliability as an informant, to learn the name of the person whom Eric Butera heard talk about the Starbucks murders, and to acquire drugs or information from individuals at the house.[2] As to the origin of Eric Butera's participation in the undercover plan, Terry Butera presented evidence that the police officers devised the undercover plan and actively solicited Eric Butera, who had ceased being a drug user, for this operation. The District of Columbia presented evidence that, from the outset, Eric Butera volunteered to return to the Greenleaf Gardens house, which he had visited on numerous occasions (and whose residents he knew) to "get more information."

The evidence was also in conflict regarding the degree to which the officers made Eric Butera aware of the dangers associated with the undercover operation. Terry Butera presented evidence that the officers did not notify Eric Butera of a drug bust that had occurred at the house on the previous evening (December 3, 1999), of the activities of two violent criminal gangs in the area, of the violent crimes that were being investigated in the area, or of the risks associated with the undercover operation. The District of Columbia responded with evidence that Eric Butera knew the people in the area and did not think that the environment was dangerous for him. The District of Columbia admitted, however, that Lieutenant McAllister did not fully advise Eric Butera of the potential risks of physical harm.

Finally, Terry Butera introduced evidence disputing the adequacy of the mea-

---

**2.** At trial, the District of Columbia admitted that the officers could have obtained a search warrant without the aid of Eric Butera.

sures taken to ensure Eric Butera's safety. Specifically, Terry Butera submitted evidence that the officers failed to (1) use surveillance equipment and wires; (2) make arrangements for safety and danger signals; (3) set time limits for the operation; or (4) enlist the assistance of the MPD's First District, where the undercover operation was to occur, or of specialized MPD narcotics, special investigations, and electronic surveillance units. Through admissions by the District of Columbia, she presented evidence that the officers had planned the undercover operation recklessly without conducting a full assessment of the need to use a citizen in a controlled drug buy, and that Sergeant Breul had admitted to the MPD's Office of Internal Affairs that, in carrying out the undercover operation, Eric Butera's safety was not the officers' principal concern. In response, the District of Columbia introduced evidence that Eric Butera did not want to wear a wire, and that he insisted that he was "comfortable with going to the area" because "[e]verybody down there knew him." The District of Columbia admitted, however, that other precautions could have been taken to ensure Eric Butera's safety.

*B. Procedural History.* Terry Butera, on behalf of herself and the estate of Eric Butera, sued the District of Columbia, and Lieutenant McAllister, Sergeant Breul, Detective Patterson, and Detective Brigidini ("the officers"), for negligence under the District of Columbia Wrongful Death Act and the District of Columbia Survival Act, for violation of her son's and her own constitutional rights under 42 U.S.C. § 1983, and at common law for negligence and intentional infliction of emotional dis-

tress. The District of Columbia moved for summary judgment under Fed.R.Civ.P. 56, arguing that the civil rights claims under § 1983 should be dismissed as a matter of law because neither Eric Butera nor his mother could assert a substantive due process violation and, in any event, the officers were entitled to qualified immunity. In addition, the District of Columbia argued that punitive damages could not be awarded against the District of Columbia as a matter of law, and, alternatively, that even if punitive damages were so recoverable, no such award was justified by the evidence.[3]

The district court denied the motion for summary judgment. *See Butera v. District of Columbia,* 83 F.Supp.2d 15 (D.D.C. 1999) (*"Butera I"*). The court concluded that both Eric and Terry Butera could assert substantive due process claims, based on Eric Butera's right to life and Terry Butera's right to her son's companionship. *See id.* at 19 & n. 3. The district court also ruled that the allegations in the complaint "present[ed] circumstances upon which a jury might find the existence of 'extraordinary circumstances'" necessary to award punitive damages against the District of Columbia. *Id.* at 22.

After trial, the jury returned a verdict against the District of Columbia and the four officers on the Survival Act and Wrongful Death Act claims (but not on Terry Butera's claim for intentional infliction of emotional distress), and against the four officers (but not the District of Columbia) under 42 U.S.C. § 1983, and awarded Terry Butera compensatory and punitive damages.[4] The District of Colum-

---

3. The District of Columbia and the officers also argued that they were entitled to summary judgment because (1) Eric Butera's negligence claims were barred by the doctrine of assumption of risk; (2) Terry Butera's intentional infliction of emotional distress claim failed as matter of law, and (3) Terry Butera's claims of negligent training and supervision by the District were barred because she had already sued to hold the District of Columbia vicariously liable on a theory of respondeat

superior. Terry Butera subsequently abandoned, and the district court dismissed, her claims of negligent training and supervision. *See Butera I,* 83 F.Supp.2d at 18 n.1.

4. The jury awarded the following damages:

Compensatory Damages

| | |
|---|---|
| Survival Act Claim | $ 462,000 |
| Wrongful Death act Claim | $ 68,000 |
| Civil Rights Claim of Eric Butera | $36,000,000 |

bia moved for judgment as a matter of law under Fed.R.Civ.P. 50, or for a new trial and vacatur or remittitur of the damages awards under Fed.R.Civ.P. 59. The district court denied the motion. *See Butera II,* 83 F.Supp.2d at 27–38.

## II.

On appeal, the District of Columbia contends that the district court erred in denying it judgment as a matter of law, or alternatively a new trial or remittitur, for essentially three reasons: First, the officers are not constitutionally liable to Eric or Terry Butera on their § 1983 claims because (A) the officers did not have a constitutional duty to protect Eric Butera from private violence, (B) Terry Butera had no constitutional interest in the companionship of her adult son, and (C) even if such rights existed, the officers were entitled to qualified immunity because it was not clearly established prior to Eric Butera's death that their conduct would violate the Due Process Clause.[5] Second, the punitive damages awards should be vacated because (A) there is no allegation that the officers intended to injure or expose Eric Butera to harm by third parties, nor

is there evidence that the officers acted with evil motive or actual malice, and (B) as a matter of District of Columbia law, punitive damages cannot be awarded against the District of Columbia; alternatively, if punitive damages against the District of Columbia were permissible, there was no evidence of extraordinary circumstances to justify such an award. Third, the damages awards under the Survival and Wrongful Death Acts must be set aside because (A) Terry Butera failed to establish a national standard of care, and (B) the district court's refusal to allow a substitute for the District of Columbia's disqualified expert was prejudicial.

We address in Part II the District of Columbia's challenge to the constitutional claims. In Part III, we address the issue of punitive damages. Finally, in Part IV, we address the evidentiary issues regarding the statutory claims.[6]

■■■ *Constitutional Claims.* Section 1983 allows a plaintiff to seek money damages from government officials who have violated her constitutional rights. *See* 42 U.S.C. § 1983.[7] Qualified immunity, on

| | |
|---|---|
| Civil Rights Claim of Terry Butera | $34,000,000 |
| | |
| Punitive Damages | |
| Against the District of Columbia | $27,000,000 |
| Against the four Officers | $ 570,000 |
| ($142,000 for each officer) | |

**5.** Alternatively, the District of Columbia contends that the $36 and $34 million compensatory awards on the civil rights claims are excessive and should be remitted.

**6.** Terry Butera relies on *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984), in contending that the District of Columbia is barred from raising certain issues on appeal because it did not raise exactly the same theories in the district court. By contrast with *Air Florida,* however, the record establishes that the District of Columbia, with one exception, is not presenting entirely new contentions on appeal. *See Butera II,* 83 F.Supp.2d at 30–33; *Butera I,* 83 F.Supp.2d at 18–22. We do not reach the exception—the District of Columbia's constitutional and evidentiary challenges to the amount of the punitive damages award

against it—because we vacate this award as a matter of law. *See infra* Part III.B.

**7.** Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Claims of substantive due process violations by State officials are generally analyzed under the Due Process Clause of the Fourteenth Amendment, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. While the District of Columbia is not a state, it is subject to the Due Process Clause of the Fifth Amendment, which also states that "[n]o person shall be ... deprived of life, liberty, or

the other hand, generally shields State officials from liability for their discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To evaluate a substantive due process claim in which State officials have raised the defense of qualified immunity, and particularly where defendants can be spared the burdens of long trials and where the court can provide clarity in standards for official conduct, the Supreme Court has instructed that courts ordinarily follow a two-prong analysis. *See Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Harbury v. Deutch,* 233 F.3d 596, 601–02 (D.C.Cir.2000); *Kalka v. Hawk,* 215 F.3d 90, 95–98 (D.C.Cir. 2000). First, courts must address the threshold issue in any action brought under § 1983: "whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692 (quoting *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)); *see also Sacramento,* 523 U.S. at 841 n. 5, 118 S.Ct. 1708; *Baker v. McCollan,* 443 U.S. 137, 146–47, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). In this stage, courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning:

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Consequently, the court must define the right to a degree that would allow officials "reasonably [to] anticipate when their conduct may give rise to liability for damages," thus preserving "the balance that [Supreme Court] cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Id.* (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

Put otherwise, the constitutional right must be identified "at the appropriate level of specificity" for a court to determine the second prong of the inquiry: whether the right was "clearly established." *Wilson,* 526 U.S. at 615, 119 S.Ct. 1692. A constitutional right was "clearly established" at the time of the events in question only if "[t]he contours of the right [were] sufficiently clear that a reasonable officer would understand that what he [was] doing violate[d] that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *see also Harris v. District of Columbia,* 932 F.2d 10, 13 (D.C.Cir.1991); *Martin v. Malhoyt,* 830 F.2d 237, 253 (D.C.Cir.1987). As the Court stated in *Anderson,* "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." 483 U.S. at 640, 107 S.Ct. 3034 (citation omitted).

property, without due process of law." U.S. Const. amend. V. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

■ The district court ruled in denying summary judgment to the District of Columbia that Eric Butera had a constitutional right to "life," and that Terry Butera had a "constitutionally protected liberty interest" in the companionship of her son. *Butera I,* 83 F.Supp.2d at 19 & n. 3. At trial, the district court instructed the jury that Eric Butera's right to "life," "personal security," "bodily integrity," and "personal privacy," and Terry Butera's right to her son's companionship, were "clearly-established constitutional rights as of the date of the incident, December 4, 1997."[8] On appeal, the court reviews *de novo* the district court's legal conclusion that the constitutional rights allegedly violated existed and that they were clearly established as a matter of law in December 1997. *See Mitchell v. Forsyth,* 472 U.S. 511, 528 n. 9, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *United States v. Popa,* 187 F.3d 672, 674 (D.C.Cir.1999).

■ Under the first stage of the *Wilson* inquiry—whether the plaintiff has asserted the relevant constitutional rights at the appropriate level of specificity—we conclude, consistent with the Supreme Court's instructions in *Anderson* and *Wilson,* that the district court erred by defining the constitutional rights as Eric Butera's right to life, bodily integrity, personal security, and personal privacy, and as Terry Butera's "liberty interest" in the companionship of her son. Although courts have acknowledged the existence of these general rights in certain circumstances, *see, e.g., Ingraham v. Wright,* 430 U.S. 651, 674–75, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Kneipp v. Tedder,* 95 F.3d 1199, 1201 (3d Cir.1996); *Wood v. Ostrander,* 879 F.2d 583, 589 (9th Cir.1989), they are overly broad where a qualified immunity defense is asserted. Applying the standards of *Wilson* and *Anderson,* we conclude that the relevant inquiries are (1) whether Eric Butera has a constitutional right to protection by the District of Columbia from danger that it created or enhanced that resulted in harm by third parties, and (2) whether Terry Butera has a liberty interest in the society and companionship of her independent adult child. This narrower definition of the rights allows a reasonable police officer to anticipate whether his actions amount to a constitutional violation.

■ *A. State Endangerment.* As a general matter, a State's failure to protect an individual from private violence, even in the face of a known danger, "does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *see also Harris,* 932 F.2d at 13. The Due Process Clause, the Supreme Court has emphasized, is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney,* 489 U.S. at 195, 109 S.Ct. 998. Thus, the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual." *Id.* at 196, 109 S.Ct. 998. It followed in *DeShaney* that the State was not constitutionally liable for the permanent brain damage to a child who was beaten severely by his father, notwithstanding evidence that the State was aware of the child's physical abuse yet failed to remove the child from his father's custody. *See id.* at 202, 109 S.Ct. 998.

Despite this general rule, the *DeShaney* Court acknowledged that, in "certain limit-

---

8. Having declared that the constitutional rights were clearly established, the district court allowed the jury to determine whether a reasonable police officer could have believed that his conduct did not violate the clearly-established constitutional rights and whether, for purposes of qualified immunity, the officers' conduct was sufficiently egregious to constitute a due process violation. *See Butera I,* 83 F.Supp.2d. at 19.

ed circumstances[,] the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. 998. One such circumstance, the Court stated, arises when the State "takes a person into its custody and holds him there against his will," hence depriving him of liberty. *Id.* at 199–200, 109 S.Ct. 998; *see also Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *LaShawn v. Kelly*, 990 F.2d 1319, 1325 (D.C.Cir.1993). In this circuit, the custody exception is narrowly construed: Mere police interaction with or assistance to an individual, for example, does not necessarily amount to custody. *See Harris*, 932 F.2d at 14–15. Thus, in *Harris*, the court held that police officers did not have a constitutional obligation to provide medical care to a victim of a drug overdose whom they encountered on the street and placed in restraints for his own safety. *See id.* at 13–15. In so holding, the court noted that the Due Process Clause is "phrased in the negative— '[n]o State shall deprive any person'—and does not easily admit of a construction imposing on government officials the duty affirmatively to do anything." *Id.* at 13. Unlike cases in which the Supreme Court declared the State's "affirmative duty to protect" individuals in custody, *see, e.g., City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Youngberg*, 457 U.S. at 315–16, 102 S.Ct. 2452; *Estelle*, 429 U.S. at 104, 97 S.Ct. 285,[9] the court stated, "Harris had not been formally committed, either by conviction, involuntary commitment, or arrest, to the charge of the District"; hence, "the government had not entered into a special relationship with

Harris." *Harris*, 932 F.2d at 14. Consequently,

> any affirmative constitutional duty on the District officials to look after [Harris'] medical needs would ... have to arise not ... "from the limitation which [they] ... imposed on [Harris'] freedom to act on his own behalf," but from the limitation which they imposed (by locking him in the police van) on the possibility of others learning of Harris' condition and coming to his aid.

*Id.* at 14 (quoting *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998). The court continued, "it is no longer the 'deprivation of liberty' which causes the injury, as was deemed crucial in *DeShaney* to trigger due process protections, so much as the 'deprivation of visibility' or the appearance of helplessness." *Id.* at 15. Moreover, the court observed, "we are not at all confident that it will be subsequently determined by the Supreme Court (or other federal courts) that the *Youngberg* line [i.e., the custody definition,] will be extended to this kind of situation." *Id.*

In addition to custody, the *DeShaney* Court left open the possibility that, under a second set of circumstances, the State could be liable for harm inflicted to an individual by third parties. In explaining the absence of constitutional liability for the child's physical abuse by his father, the Court stated:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them.

*DeShaney*, 489 U.S. at 201, 109 S.Ct. 998. All circuit courts of appeals, except this circuit, have by now relied on this passage in *DeShaney* to acknowledge that there may be possible constitutional liability un-

---

9. In *Estelle,* the Supreme Court held that the cruel and unusual punishment clause of the Eighth Amendment obliges the State to provide medical care to prisoners. *See* 429 U.S. at 103–04, 97 S.Ct. 285. *Youngberg* extended this obligation as a matter of substantive due process to mental patients who were involun-

tarily committed. *See* 457 U.S. at 315–16, 102 S.Ct. 2452. In *Revere,* the Supreme Court held that the Due Process Clause also requires the State to provide medical care to persons who were injured while being apprehended by the police. *See* 463 U.S. at 244, 103 S.Ct. 2979.

der § 1983 "where the state creates a dangerous situation or renders citizens more vulnerable to danger."[10] *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.1993), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993).[11] In *Reed,* police officers arrested a presumably sober driver and left behind an obviously intoxicated passenger, who subsequently drove the car and was involved in a collision with the victims. The Seventh Circuit held that the victims of the collision stated a substantive due process claim because "[p]olice officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger."[12] *Id.* at 1125. Similarly, in *Wood,* a police officer arrested a drunk driver at 2:30 a.m. and impounded his vehicle, leaving the driver's female passenger by the side of the road in a high-crime area. The passenger, who was five miles from her home, accepted a ride from a stranger, who raped her. *See*

879 F.2d at 586. The Ninth Circuit held that the passenger had "raised a triable issue of fact as to whether [the police officer] affirmatively placed [her] in a position of danger." *Id.* at 589–90 (citation omitted). Additionally, in *Kallstrom v. City of Columbus,* 136 F.3d 1055 (6th Cir. 1998), city officials released personal information from the files of undercover police officers (including names, addresses, and telephone numbers of the officers and their families) to defense counsel for the alleged drug conspirators whom the officers had investigated. The Sixth Circuit held that "the City's actions placed the officers and their family members in 'special danger' by substantially increasing the likelihood that a private actor would deprive them of their liberty interest in personal security." *Id.* at 1067.

The circuit courts have adopted the State endangerment concept in a range of fact patterns concerning alleged miscon-

**10.** *See, e.g., Frances–Colon v. Ramirez,* 107 F.3d 62, 64 (1st Cir.1997); *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993); *Kneipp v. Tedder,* 95 F.3d 1199, 1201 (3d Cir.1996); *Pinder v. Johnson,* 54 F.3d 1169, 1175–77 (4th Cir.1995) (en banc), *cert. denied,* 516 U.S. 994, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995); *Johnson v. Dallas Indep. Sch. Distr.,* 38 F.3d 198, 200–01 (5th Cir.1994), *cert. denied,* 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995); *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066–67 (6th Cir. 1998); *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.1993), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); *Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc), *cert. denied,* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993); *Wood v. Ostrander,* 879 F.2d 583, 589–90 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Uhlrig v. Harder,* 64 F.3d 567, 572 & n. 7 (10th Cir.1995), *cert. denied,* 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Wyke v. Polk County Sch. Bd.,* 129 F.3d 560, 567 (11th Cir.1997).

**11.** Even before *DeShaney,* several courts of appeals had recognized a State's constitutional duty to protect an individual whom the State placed in a situation of heightened danger. *See, e.g., Wells v. Walker,* 852 F.2d 368, 370–71 (8th Cir.1988); *Escamilla v. City of Santa Ana,* 796 F.2d 266, 269 (9th Cir.1986); *Estate of Gilmore v. Buckley,* 787 F.2d 714,

722 (1st Cir.1986); *Jones v. Phyfer,* 761 F.2d 642, 646 (11th Cir.1985); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982).

**12.** Like this court in *Harris,* which refused to adopt an expanded definition of "custody," the Seventh Circuit in *Reed* was reluctant to "expand any existing duties for police officers," 986 F.2d at 1127. Nonetheless, the court imposed a duty where officers "knowingly and affirmatively create a dangerous situation for the public and fail to take reasonable preventative steps to diffuse that danger." *Id.* In *Gregory v. City of Rogers,* 974 F.2d 1006 (8th Cir.1992) (en banc), the Eighth Circuit reached a different conclusion on a somewhat similar fact pattern. In *Gregory,* a police officer detained the designated driver of a drinking group and allowed him to follow the officer to the police station. The driver entered the police station, leaving the keys inside the car; one of the intoxicated passengers drove away and had an accident. *See id.* at 1007–08. The court concluded that the police officer had not taken the requisite affirmative actions to trigger liability under the State endangerment concept, because it was the designated driver (and not the police officer) who placed the passengers in danger by leaving the keys in the car. *See id.* at 1012.

duct by State officials.[13] Regardless of the conduct at issue, however, the circuits have held that a key requirement for constitutional liability is affirmative conduct by the State to increase or create the danger that results in harm to the individual. No constitutional liability exists where the State actors "had no hand in creating a danger but [simply] 'stood by and did nothing when suspicious circumstances dictated a more active role for them.'" *Reed,* 986 F.2d at 1125 (quoting *DeShaney,* 489 U.S. at 203, 109 S.Ct. 998); *see also Kallstrom,* 136 F.3d at 1066; *Armijo v. Wagon Mound Public Schools,* 159 F.3d 1253, 1262–63 (10th Cir.1998); *Frances-Colon v. Ramirez,* 107 F.3d 62, 64 (1st Cir.1997); *Estate of Stevens v. City of Green Bay,* 105 F.3d 1169, 1176–77 (7th Cir.1997); *Johnson v. Dallas Indep. Sch. Distr.,* 38 F.3d 198, 201 (5th Cir.1994); *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993); *Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992) (en banc); *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992). Absent such affirmative conduct by the State to endanger an individual, courts have rejected liability under a State endangerment concept. *See, e.g., S.S. v. McMullen,* 225 F.3d 960, 962 (8th Cir. 2000) (en banc); *Stevens v. Umsted,* 131 F.3d 697, 705 (7th Cir.1997).

Unlike other circuit courts of appeals, this court has never been presented with a State endangerment claim; rather, it has only addressed the first *DeShaney* exception–custody. In *Harris,* for example, the court was confronted with a claim that officers had a constitutional obligation to provide medical care to a drug overdose victim whom they had restrained in a police wagon for his own safety. In this context, the court addressed the contention that the officers entered into a "special relationship" with the victim because they placed him in police custody. *See Harris,* 932 F.2d at 14.[14] Similarly, in *LaShawn,* the court was confronted with a claim of constitutional liability based on *DeShaney*'s custody exception. In *LaShawn,* class action plaintiffs brought constitutional and statutory claims against the District of Columbia, alleging abuses in the District of Columbia's child welfare and foster care system. *See* 990 F.2d at 1320–21. The district court ruled that the plaintiffs had stated a due process claim based on *DeShaney*'s concept of custody, because "the rights of children in foster care [were] analogous to the rights of the involuntarily committed." *LaShawn v. Dixon,* 762 F.Supp. 959, 992 (D.D.C.1991). On appeal, the court avoided reaching the constitutional and federal statutory issues, choosing instead to address the claims presented under District of Columbia statutes and regulations. *See LaShawn,* 990 F.2d at 1324.[15] Only now is the court directly

---

**13.** Plaintiffs have brought § 1983 suits under the State endangerment theory for the actions of various types of State actors, including police officers, *see, e.g., Reed,* 986 F.2d at 1123; supervisors of State custodial institutions, *see, e.g., L.W. v. Grubbs,* 974 F.2d 119, 120 (9th Cir.1992); city officials, *see, e.g., Kallstrom,* 136 F.3d at 1059; and public school officials, *see, e.g., Armijo v. Wagon Mound Public Schools,* 159 F.3d 1253, 1256 (10th Cir.1998); *Stevens v. Umsted,* 131 F.3d 697, 699 (7th Cir.1997).

**14.** The concurrence in *Harris* alludes to the State endangerment exception, *see* 932 F.2d at 17, but does not directly address it.

**15.** The court concluded in *LaShawn* that the District of Columbia statutes created a private right of action both for children who were in its foster care and for children who were

abused or neglected but not yet in its custody. *See* 990 F.2d at 1325. Citing District of Columbia precedent that "conclusively" showed this to be the case for the latter category of plaintiffs under the District of Columbia Prevention of Child Abuse and Neglect Act, *id.* (citation omitted), the court reasoned that, in view of the Act's application to children who were not yet in custody, it "seem[ed] self-evident that th[e] Act ... also creates privately enforceable rights for those children actually in the District [of Columbia]'s custody." *Id.* In dictum, the court interpreted *DeShaney* to hold that "the state has a constitutional duty to assume responsibility for the safety and well-being of a person *only* when the state takes that person into its custody." *Id.* (emphasis added).

confronted with a plaintiff's express § 1983 claim of State endangerment.

■ The development of the State endangerment concept by the circuit court of appeals is consistent with the notion, implied in *DeShaney*, that something less than physical custody may suffice to present a substantive due process claim. We join the other circuits in holding that, under the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm.[16] In so doing, we are "mindful of the caution we must exercise in expanding the liberty interests protected by substantive due process," *Harbury*, 233 F.3d at 605 (citing and quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)), but conclude that the circuits' exposition of the concept has mitigated some of the general concerns about the lack of guideposts; to that extent, the court is hardly "break[ing] new ground in this field." *Collins*, 503 U.S. at 125, 112 S.Ct. 1061.

■ To assert a substantive due process violation, however, the plaintiff must also show that the District of Columbia's conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sacramento*, 523 U.S. at 847 n. 8, 118 S.Ct. 1708. This stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law. *See id.* at 845–46, 848–49, 118 S.Ct. 1708; *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also*

*Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Hence, while it may be possible under District of Columbia tort law for a plaintiff to obtain a remedy by proving mere negligence or failure to exercise due care, this "lowest common denominator of customary tort liability" is "categorically beneath the threshold of constitutional due process." *Sacramento*, 523 U.S. at 848–49, 118 S.Ct. 1708.

> It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Id.* at 849, 118 S.Ct. 1708. Hence, in *Sacramento*, in the context of a highspeed chase by police officers that accidentally killed a fleeing motorcyclist, the Supreme Court held that the plaintiff must satisfy the higher "intent to harm" standard to prove that the officers' behavior was conscience-shocking. *See id.* at 854, 118 S.Ct. 1708.

The Supreme Court in *Sacramento* acknowledged, however, that in some circumstances the "point of the conscience shocking" can be reached by proving "something more than negligence but 'less than intentional conduct, such as recklessness or gross negligence.'" *Id.* at 849, 118 S.Ct. 1708 (citation omitted). While such proof "is a matter for closer calls," *id.*, this lower threshold, the Supreme Court has instructed, is appropriate in circumstances where the State has a heightened obligation toward the individual. For example, where the State has taken a person into custody, it "so restrains [his] liberty that it renders him unable to care for himself"; therefore, the "Constitution imposes upon [the State]

---

16. Because we hold that the right arising from State endangerment was not clearly established in this circuit at the time of Eric Butera's death, we do not address whether the possibly voluntary nature of his conduct would relieve or mitigate the District of Columbia of constitutional liability. *See Summar v. Bennett*, 157 F.3d 1054, 1060 n. 2 (6th Cir.1998).

a corresponding duty to assume some responsibility for his safety and general well–being." *Id.* at 851, 118 S.Ct. 1708 (quoting *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. 998). Further, where an individual is in State custody, prison officials have "the luxury ... of ... time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853, 118 S.Ct. 1708. Because of these special circumstances, a State official's deliberate indifference in the context of state custody can be "truly shocking." *Id.*

■ As in the context of State custody, the State also owes a duty of protection when its agents create or increase the danger to an individual. Like prison officials who are charged with overseeing an inmate's welfare, State officials who create or enhance danger to citizens may also be in a position where "actual deliberation is practical." *Id.* at 851, 118 S.Ct. 1708. In the instant case, the officers had the opportunity to plan the undercover operation with care. In view of the officers' duty to protect Eric Butera, he may prove that the officers' treatment of him in connection with the attempted undercover drug buy "shocked the conscience" by meeting the lower threshold of "deliberate indifference." *See Radecki v. Barela,* 146 F.3d 1227, 1232 (10th Cir.1998); *L.W. v. Grubbs,* 92 F.3d 894, 896 (9th Cir.1996).

■ The remaining question, under the second prong of the *Wilson* test, is whether, in December 1997, the law surrounding the violation of Eric Butera's asserted due process right to be protected from third-party violence in the context of State endangerment was "sufficiently clear that a reasonable officer would understand that what he [was] doing violate[d] that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *see also Wilson,* 526 U.S. at 615, 119 S.Ct. 1692. Qualified immunity is intended to "provide government officials with the ability 'reasonably to anticipate when their conduct may give rise to liability for damages,' " *Anderson,* 483 U.S. at 646, 107 S.Ct. 3034 (citation omitted). In light of this purpose, an official "[cannot] reasonably be expected to anticipate subsequent legal developments, nor ... fairly be said to 'know' that the law forb[ids] conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. Consequently, the court must determine whether the Supreme Court, the District of Columbia Circuit, and, to the extent that there is a consensus, other circuits have spoken clearly on the lawfulness of the conduct at issue.[17] *See Clanton v. Cooper,* 129 F.3d 1147, 1156–57 (10th Cir.1997); *Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993).

Upon examining relevant case law on the "State endangerment" exception to *DeShaney,* we conclude that, in December 1997, Eric Butera's constitutional right to protection by the District of Columbia from third-party violence was not clearly established within the meaning of *Anderson.* First, as discussed, this circuit has never recognized constitutional liability in the context of a State endangerment claim, and the court in *Harris* intimated that it would construe narrowly the express custody exception set forth in *DeShaney.*[18] *See* 932 F.2d at 13. Further-

---

**17.** In *Anderson,* the Supreme Court made clear that, in evaluating whether the right at issue was clearly established, a court need not have found the very action in question unlawful in the past. *See id.* at 640, 107 S.Ct. 3034. Rather, a court must consider whether "in the light of pre-existing law the unlawfulness [was] apparent." *Id.* To make this determination, however, the parties have pointed us to no source other than case law from the Supreme Court and the circuits.

**18.** This court and the District of Columbia Court of Appeals have acknowledged that, in regard to liability for negligence, if a "special relationship" exists between an individual and the police, the latter has a "duty to protect." *Malhoyt,* 830 F.2d at 259 (citation omitted); *see also Butera II,* 83 F.Supp.2d at 31. To determine whether a "special relationship" exists, the District of Columbia courts ask whether the police "have beg[un] to act in behalf of a particular citizen in such

more, *LaShawn*, albeit in dictum, did not indicate any circumstance other than custody that would give rise to District of Columbia liability. *See* 990 F.2d at 1325. Moreover, the only Supreme Court authority to support a State endangerment concept consisted of the often-quoted dictum in *DeShaney*, which simply "leaves the door open for liability" in this context. *Reed*, 986 F.2d at 1125.

Second, as of 1997, the "contours" of the rights created by the State endangerment concept were not settled among the circuits. *See Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. While courts of appeals had adopted the State endangerment concept without prompting Supreme Court review,[19] there was little consistency in courts' explanations of the types of actions that would amount to constitutional liability. The Eighth Circuit, for example, first acknowledged that "[i]t is not clear, under *DeShaney*, how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect." *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir.1990). The court later stated that, to establish constitutional liability, the plaintiff must demonstrate that he "would not have been in harm's way but for the government's affirmative actions." *Carlton v. Cleburne County*, 93 F.3d 505, 508 (8th Cir.1996). The Seventh Circuit, in turn, provided a slightly different standard, finding State endangerment where the State "*greatly* increased the danger to [the plaintiff] while constricting access to self-help." *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1177 (7th Cir. 1997) (emphasis added). Other circuits, however, adopted more elaborate tests to determine whether the actions of State officials amounted to State endangerment and therefore triggered constitutional liability.[20]

a way as to raise significantly the quotient of risk over and above the risks assumed by every other member of the community." *Malhoyt*, 830 F.2d at 259 (quoting *Morgan v. District of Columbia*, 468 A.2d 1306, 1312 (D.C.1983)). The issue of constitutional liability, however, involves considerations not pertinent to the negligence inquiry. *See, e.g., Sacramento*, 523 U.S. at 848–49, 118 S.Ct. 1708.

**19.** *See, e.g., Uhlrig*, 64 F.3d 567, *cert. denied*, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Pinder*, 54 F.3d 1169, *cert. denied*, 516 U.S. 994, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995); *Johnson*, 38 F.3d 198, *cert. denied*, 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995); *Reed*, 986 F.2d 1122, *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); *City of Rogers*, 974 F.2d 1006, *cert. denied*, 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993); *Wood*, 879 F.2d 583, *cert. denied*, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).

**20.** For example, while stating in 1995 that it had "yet to decide definitively whether the State endangerment theory is a viable mechanism for finding a constitutional injury," the Third Circuit identified four elements that State endangerment cases from other circuits had "in common":

(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; [and] (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.1995). In 1996, the Third Circuit applied the four elements outlined in *Mark* to hold that an individual could assert a constitutional claim based on the State endangerment theory. *See Kneipp*, 95 F.3d at 1208–11. The Fifth Circuit, in turn, stated the following common elements, while also acknowledging in 1994 that it had never predicated relief based on a State endangerment claim:

[T]he environment created by the state actors must be dangerous; they must know it is dangerous; and ... they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.

*Johnson*, 38 F.3d at 201. Finally, the Tenth Circuit expounded a multi-part test to determine whether the defendant created a "special danger" sufficient to trigger the State's constitutional liability:

Plaintiff must demonstrate that (1) [plaintiff] was a member of a limited and specifically definable group; (2) Defendants' conduct put [the plaintiff] ... at substantial

While all of these tests share the key element of State endangerment, namely, affirmative conduct by State actors, *see, e.g., Reed,* 986 F.2d at 1126, they are inconsistent in their elaborations of the concept. For example, the circuits have adopted different nexus requirements, *compare Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.1995), *and Carlton,* 93 F.3d at 508, *with Uhlrig v. Harder,* 64 F.3d 567, 574 (10th Cir.1995), and employed differing degrees of specificity in defining actionable conduct, *compare Estate of Stevens,* 105 F.3d at 1177, *and Carlton,* 93 F.3d at 508, *with Johnson,* 38 F.3d at 201, *Mark,* 51 F.3d at 1152, *and Uhlrig,* 64 F.3d at 574. Moreover, although we do not suggest that State liability would necessarily be eliminated or mitigated, to date no circuit has applied the State endangerment concept where an arguably voluntary informant, much less a police operative like Eric Butera, was involved. *See supra* note 16. This lack of clarity in the law of the circuits leads us to conclude that no reasonable police officer would have known that his or her actions were subject to a State endangerment limitation. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. *Harris'* silence, and *LaShawn's* restrictive dictum, as to the second *DeShaney* exception gave no such warning in this circuit. *See LaShawn,* 990 F.2d at 1325; *Harris,* 932 F.2d at 13.

Given the criteria imposed by the qualified immunity defense, as well as the absence of Supreme Court and District of Columbia Circuit precedent, we hold that the law in this circuit was insufficiently clear in December 1997 to alert the District of Columbia and its police officers to possible constitutional liability (as distinct from tort liability) for their conduct in using Eric Butera as a police operative in

an undercover operation. While the law was evolving in the circuits to cover situations where either (1) there was State control or custody, or (2) the State knowingly created or increased the risk that an individual would be exposed to danger, we do not know whether, had a State endangerment concept been recognized in this circuit in 1997, Eric Butera's claim would have survived. In any event, the officers were entitled to qualified immunity.

*B. Right to the Companionship of an Adult Child.* Terry Butera's claim of a constitutional right to the companionship of her 31–year–old son has a more difficult hurdle to overcome: It fails the first prong of the *Wilson* test. The Supreme Court has not spoken to the precise issue, and the precedent in this and nearly all of the other circuits suggests that no such right exits.

Terry Butera testified that her son was an adult, living on his own, and that he was not providing her with any financial assistance at the time of his death. The evidence further showed that Eric Butera had moved out of his mother's house when he was eighteen years old, married, moved to Pennsylvania, and had a child. In allowing Terry Butera to claim a due process interest in the society and companionship of her adult son, the district court relied solely on our opinion in *Franz v. United States,* 707 F.2d 582 (D.C.Cir.1983). *See Butera II,* 83 F.Supp.2d at 31; *Butera I,* 83 F.Supp.2d at 19 n. 3. In *Franz,* federal officials relocated and changed the identities of a divorced mother and her minor children pursuant to the Federal Witness Protection Program, with "the effect of severing the ongoing relationship between the children and their natural father." 707 F.2d at 585. The children's father sued the United States on statutory

risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking.

*Uhlrig,* 64 F.3d at 574. In 1998, the Tenth Circuit added another criterion to the *Uhlrig* test: Plaintiff must show "that the charged state entity and the charged individual defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way." *Armijo,* 159 F.3d at 1263.

and constitutional grounds, alleging a violation of his constitutionally protected right to his children's companionship. In holding that such a right existed, the *Franz* court acknowledged "the profound importance of the bond between a parent and a child to the emotional life of both." *Id.* at 599. The court expressed "skepticism" at governmental interference with a parent's right to "shape the development" of his children and to be intimately involved in the "rearing of his offspring." *Id.* at 597–99.

On appeal, Terry Butera relies on *Franz*, as well on cases from other circuits that recognize parents' constitutionally protected liberty interest in the companionship and custody of their children and in the "maintenance and integrity of the family." *Estate of Bailey v. County of York*, 768 F.2d 503, 509 n. 7 (3d Cir.1985), *overruled in part by DeShaney*, 489 U.S. at 202, 109 S.Ct. 998; *see also Kelson v. City of Springfield*, 767 F.2d 651, 653–54 (9th Cir.1985); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1243–44 (7th Cir.1984). In *Bell*, the Seventh Circuit recognized this constitutional interest in the context of a plaintiff's twenty-three-year-old son.[21] *See* 746 F.2d at 1242–45.

The general statements in *Franz*, as well as in the Supreme Court cases on which *Franz* relies, focus on securing the rights of parents to have custody of and to raise their *minor* children in a manner that develops "parental and filial bonds free from government interference." *Franz*, 707 F.2d at 595. This emphasis is clear in cases such as *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), where, in the context of the prosecution of a child's guardian for furnishing her with religious literature to sell on the public streets in violation of child labor laws, the Court stated that "the custody, care, and nurture of the child reside first in the parents," *id.* at 166, 64 S.Ct. 438, and *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195, (1968), where the Court recognized parents' right "to direct the rearing of their children [as] basic in the structure of our society." *Id.* at 639, 88 S.Ct. 1274. Moreover, while the Court in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), recognized a parent's constitutional interest in the "companionship" of his children, it did so in the context of a parent's right to the custody and care of a minor child. *See id.* at 651, 92 S.Ct. 1208. We find nothing in Supreme Court case law to indicate an intention to extend these concerns in support of a constitutional liberty interest in a parent's relationship with her adult son. Indeed, two of the three cases on which Terry Butera relies were also decided in the context of minor (not adult) children. *See Kelson*, 767 F.2d at 652–54; *Estate of Bailey*, 768 F.2d at 505, 509 n. 7. In the third case, *see Bell*, 746 F.2d at 1245, the Seventh Circuit relied largely on the same Supreme Court cases that this court cited in *Franz*, as well as on others that focus on parents' relationships with their minor children, to reject the notion that "a constitutional line based solely on the age of the child should be drawn." *Id.*[22]

■ This circuit has indicated that it is not prepared to adopt the interpretation that the Seventh Circuit espoused in *Bell*. In an addendum to *Franz*, the court ac-

---

**21.** In recognizing a constitutional right for Bell's father (the plaintiff), the Seventh Circuit noted that the decedent was single, had no children, and had not become part of another family unit other than his father's, although the two lived apart. *See Bell*, 746 F.2d at 1245. The court concluded that the victim's age and separate residence were relevant only to the amount of damages to be awarded to the father for the loss of his son's society and companionship. *See id.*

**22.** In addition to *Stanley* and *Prince*, the *Bell* court cites *Caban v. Mohammed*, 441 U.S. 380, 394, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) and *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). Both cases deal with parental interests in minor children in the context of adoption.

knowledged different constitutional treatment when the parent-child relationship involves two adults:

> When children grow up, their dependence on their parents for guidance, socialization, and support gradually diminishes. At the same time, the strength and importance of the emotional bonds between them and their parents usually decrease. Concededly, the bond between a parent and child when the child is an adult usually bears some resemblance to the same bond when the child was a minor. But, as a long line of Supreme Court cases attests, the differences between the two stages of the relationship are sufficiently marked to warrant sharply different constitutional treatment.

*Franz v. United States,* 712 F.2d 1428, 1432 (D.C.Cir.1983) (citation omitted). While the court acknowledges the importance of the parent-child relationship regardless of the child's age, and the court does not minimize the devastating loss that a parent can experience from the death of an adult child, this consideration, in view of circuit precedent, is insufficient to establish a constitutional liberty interest under § 1983. We do not think *Franz* can be read as broadly as the district court and Terry Butera suggest. Neither do we think the Supreme Court cases and other authorities on which *Bell* relied can be read to support Terry Butera's constitutional claim. Therefore, we hold that a parent does not have a constitutionally-protected liberty interest in the companionship of a child who is past minority and independent. Consequently, the district court erred in denying summary judgment on Terry Butera's due process claim.[23]

For these reasons, we hold that the District of Columbia and the four officers were entitled to summary judgment on both Eric and Terry's Butera's § 1983 claims. The officers were entitled to qualified immunity regarding Eric Butera's constitutional claim; further, Terry Butera did not have a constitutional right to the companionship of her adult son. Accordingly, we reverse the district court's order denying judgment as a matter of law and vacate the compensatory damages award on the § 1983 claims.[24]

### III.

*Punitive Damages.* The District of Columbia contends that the evidence presented by Terry Butera does not meet the stringent evidentiary standard under District of Columbia law for awarding punitive damages against the individual officers. It further contends that, as a matter of District of Columbia law, punitive damages may not be awarded against the District in this case. We conclude that the District's evidentiary challenge is wanting, *see Barbour v. Merrill,* 48 F.3d 1270, 1276 (D.C.Cir.1995), and that the district court erred in declining to vacate the punitive damages award against the District.[25]

---

**23.** Because we hold that a parent-child relationship between two independent adults does not invoke constitutional "companionship" interests, we do not reach the District of Columbia's contention that Terry Butera's claim fails because the District of Columbia's actions were not intentionally directed or aimed at her relationship with her son. *See generally Harbury,* 233 F.3d at 604–05.

**24.** Because summary judgment was warranted on Eric and Terry Butera's civil rights claims, we do not address the contentions of the District of Columbia that the § 1983 compensatory damages award was excessive and that the verdict awarded "double recovery" to Eric Butera's estate.

**25.** The jury did not allocate its punitive damages award among the constitutional and statutory claims brought by Terry Butera. On appeal, the District of Columbia has not contended that, if the court vacates the $70 million compensatory award under § 1983, it is entitled either to remittitur of the punitive damages awards or to a new trial on damages. Absent such a contention, and because "[a]n award of punitive damages cannot stand alone, unaccompanied by compensatory damages," *Bernstein v. Fernandez,* 649 A.2d 1064, 1073 (D.C.1991), we attribute the punitive damages award to Terry Butera's Survival Act and Wrongful Death Act claims.

*A. The Individual Officers.* "In the District of Columbia, with rare exceptions, punitive damages [against individuals] are available only for intentional torts." *Jemison v. National Baptist Convention, U.S.A., Inc.,* 720 A.2d 275, 285 n. 9 (D.C.1998); *see also Bernstein v. Fernandez,* 649 A.2d 1064, 1073 (D.C.1991); *Washington Med. Ctr. v. Holle,* 573 A.2d 1269, 1284 (D.C.1990). "Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's right, or other circumstances tending to aggravate the injury." *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995) (quoting *Washington Med. Ctr.,* 573 A.2d at 1284). Thus, to obtain punitive damages under District of Columbia law, Terry Butera must "prove, by a preponderance of the evidence, that the [officers] committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent." *Jonathan Woodner Co.,* 665 A.2d at 938. A jury may "infer the requisite state of mind from the surrounding circumstances." *Jemison,* 720 A.2d at 285–86. Consistent with this standard, the district court instructed the jury that it could award punitive damages

> only if the plaintiff has proved with clear and convincing evidence: One, that the defendant[s] acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or willful disregard for the rights of Eric Butera; and Two, that the defendants' [sic] conduct itself was outrageous, grossly fraudulent or reckless toward the safety of Eric Butera.

The district court further instructed the jury that it could "conclude that the [officers] acted with a state of mind justifying punitive damages based on direct evidence or based on circumstantial evidence."

In light of the evidence presented by Terry Butera, as well as the District of Columbia's admissions at trial, a reasonable jury could conclude that the officers were reckless toward Eric Butera's safety. The officers sent Eric Butera, unwatched and unmonitored, into a housing complex that they should have realized was a source of criminal narcotics sales and violence; in so doing, they never made the requisite threshold evaluation of the need to use a citizen as a police operative and thereby expose him to potential danger. Not only did the officers fail to take obvious precautionary steps, such as consulting with the MPD narcotics and special investigations units, they failed to consult with the MPD First District to determine whether there were ongoing or recent operations in the area of the Greenleaf Gardens housing complex that might interfere with or increase the danger involved in the planned undercover operation. The evidence before the jury revealed that the officers did not notify Eric Butera of possible police activity or police concerns in the area, including a drug-related arrest that had occurred at the same location on the previous night. Furthermore, while executing the operation, the officers did not arrange for monitoring or signaling devices, much less visual, auditory, or electronic surveillance from a rooftop, window, or other location. Because of carelessness with respect to Eric Butera's safety, the officers were not in a position to come to his aid when he was brutally attacked. Not until forty minutes after Eric Butera headed toward the house, when, as a result of the arrival of police officers unrelated to the undercover operation, were the officers in a position to know what had happened to him; by that time, it was too late to save Eric Butera's life.

From the entirety of the evidence, the jury could reasonably have inferred that the officers' actions were impelled by ambition for professional advancement, heedless of Eric Butera's safety. *See Jemison,* 720 A.2d at 285–86. There was testimony about the detectives getting credit for solving the high-profile Starbucks murders

from which such an inference could reasonably be drawn. That the jury did not return a verdict in favor of Terry Butera's claim for intentional infliction of emotional distress does not lessen the force of the evidence regarding the officers' conduct toward Eric Butera. Thus, because no contention is made of error in the jury instructions or of excessiveness of the punitive damages awards against the officers, the court has no basis to conclude that the district court erred in declining to vacate the punitive damages awards against the officers.[26]

**B. The District of Columbia.** In *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Supreme Court stated that "a municipality is immune from punitive damages" under § 1983. *Id.* at 271, 101 S.Ct. 2748. The District of Columbia is a municipal corporation. *See* D.C.Code § 1–102 (1999 Repl.). In addition, this court and the District of Columbia Court of Appeals have held that, absent "extraordinary circumstances," punitive damages are unavailable against the District of Columbia under District of Columbia law. *Atchinson v. District of Columbia,* 73 F.3d 418, 425 (D.C.Cir.1996); *see also Finkelstein v. District of Columbia,* 593 A.2d 591, 599 (D.C.1991) (en banc). The term "extraordinary circumstances" is a term of art in this context. In *Daskalea v. District of Columbia,* 227 F.3d 433 (D.C.Cir.2000), the court, following *Fact Concerts,* clarified the meaning of "extraordinary circumstances" to refer to circumstances such as "where a jurisdiction's taxpayers are directly responsible for perpetrating the policies that caused the plaintiff's injuries" or "where a municipality or its policymakers have in-

tentionally adopted the unconstitutional policy that caused the damages in question." *Id.* at 447. Terry Butera has made no such showing here.

Contrary to Terry Butera's contention that there was ample evidence of an "officially sanctioned cover-up" of the officers' wrongdoing and of "condonation" by the officers' superiors, she has made no showing that the District of Columbia policymakers intentionally adopted an unconstitutional policy. That none of the officers was disciplined in connection with the undercover operation does not show that the District of Columbia condoned their conduct or attempted to deny that the officers were at fault; the District of Columbia's admissions to the jury are to the contrary. Still, the jury found that the evidence was insufficient to hold the District of Columbia liable for violation of Eric and Terry Butera's claimed civil rights under § 1983. In addition, Terry Butera's contention that the jury's finding that the officers engaged in willful misconduct translates into a finding of willful misconduct by the District of Columbia is unavailing. All of the District of Columbia's actions and policies are performed through agents. If these agents' actions were always attributable to the District of Columbia, the holdings in *Fact Concerts* and *Daskalea,* emphasizing the very limited circumstances in which a court will award punitive damages against the District of Columbia, would be undermined.[27]

## IV.

*Claims under Survival Act and Wrongful Death Act.* Regarding the verdicts under the Survival and Wrongful Death

---

**26.** Although the District of Columbia asserted in moving for judgment as a matter of law under Rule 50, or for a new trial and vacatur or remittitur of the damages awards under Rule 59, that the punitive damages awards against the officers were grossly excessive, no such contention is made on appeal.

**27.** Because *Daskalea,* 227 F.3d at 447, bars the award of punitive damages against the

District of Columbia, we do not reach the District of Columbia's contention that the award was unconstitutionally excessive under *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and "infected" by the admission of prejudicial evidence (Exhibit 214) concerning the finances of the District of Columbia.

Acts, the District of Columbia contends that the district court erred first, in ruling that Terry Butera's expert witness established a national standard of care, *see Butera II*, 83 F.Supp.2d at 28–29, and second, in denying the District of Columbia's pretrial request for a substitute expert on police practices.[28]

■■■■■ *A. National Standard of Care.* Under District of Columbia law, "[t]he plaintiff in a negligence action bears the burden of proof on three issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984)); *see also Messina v. District of Columbia*, 663 A.2d 535, 537–38 (D.C.1995). To prove that a defendant deviated from the standard of care, a plaintiff need not rely on expert testimony "where the alleged negligent act is 'within the realm of common knowledge and everyday experience.'" *Toy*, 549 A.2d at 6 (quoting *District of Columbia v. White*, 442 A.2d 159, 164 (D.C.1982)); *see also Daskalea*, 227 F.3d at 445. A plaintiff must, however, "put on expert testimony to establish what that standard of care is if the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the

average layperson." *Messina*, 663 A.2d at 538 (quoting *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987)). The district court ruled that expert testimony concerning proper police procedures for the undercover operation was warranted in the instant case. *See Butera II*, 83 F.Supp.2d at 29 n. 2.

■■■ To establish a national standard of care, an expert must do more than rely on his own experience or "simply ... declare that the District violated the national standard of care."[29] *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C.1997); *see also Toy*, 549 A.2d at 7–8. The expert must refer to commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions. *See Scott v. District of Columbia*, 101 F.3d 748, 758 (D.C.Cir. 1996); *Doe v. Dominion Bank of Washington*, 963 F.2d 1552, 1563 (D.C.Cir.1992); *Phillips v. District of Columbia*, 714 A.2d 768, 775 (D.C.1998); *District of Columbia v. Bethel*, 567 A.2d 1331, 1333 (D.C.1990); *Toy*, 549 A.2d at 7–8; *Peters*, 527 A.2d at 1273. In so doing, however, the expert need not "enumerate the facilities across the country at which that standard is in effect." *District of Columbia v. Wilson*, 721 A.2d 591, 599 (D.C.1998); *see also Dominion Bank of Washington*, 963 F.2d at 1563.

---

28. The District of Columbia does not contend that it is entitled to reversal of the judgments on the statutory claims because those judgments were premised solely on the validity of the § 1983 claims against the officers. *See District of Columbia v. Evans*, 644 A.2d 1008 (D.C.1994).

29. We do not reach the district court's suggestion that a national standard of care might not have been necessary in this case. *See Butera II*, 83 F.Supp.2d at 29. While *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997), states that, "[i]n the context of actions against the District by persons in its custodial care, [the District of Columbia Court of Appeals has] been demanding in requiring proof of a national standard of care," *id.* at 635, the cases on which *Clark* relies do not appear to impose such a requirement. *See, e.g., District*

*of Columbia v. Moreno*, 647 A.2d 396, 399–400 (D.C.1994); *District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C.1990); *Toy*, 549 A.2d at 6–9. In these cases, plaintiffs simply presented experts who purported to establish a national standard of care; the court did not expressly hold that a national standard was a necessary part of the plaintiff's burden of establishing the "applicable standard of care." *Toy*, 549 A.2d at 6. As in *Moreno*, *Carmichael*, and *Toy*, Terry Butera offered Mr. Bradley "as an expert in the national standard of care in police procedures," *Butera II*, 83 F.Supp.2d at 30, and that is how the case was tried. Hence, we examine whether her expert witness established a national standard of care, without suggesting that Terry Butera was acting pursuant to a court-imposed requirement.

■ In light of these requirements, the district court could properly find that Terry Butera's expert witness, Mr. James Bradley, presented sufficient evidence to establish a national standard of care. Terry Butera presented Mr. Bradley as an expert based on his twenty-five years' experience at the MPD, which included experience as a control officer for undercover drug purchases and participation with federal agencies in undercover operations. Rather than relying on this experience in the abstract to proffer a national standard of care, Mr. Bradley set forth concrete bases for his expert testimony: his consultation with police officers in Prince George's County, his review of the MPD's General Orders, and his examination of the U.S. Department of Justice Drug Enforcement Administration Handbook and Manual, and the Narcotics Investigators' Manual of the Institute of Police Technology and Management, University of North Florida, which provides training for police officers. *See Butera II*, 83 F.Supp.2d at 28–29. This is a far cry from the expert witnesses at issue in the cases that the District of Columbia cites. In *Toy*, 549 A.2d at 8, for example, the expert did not rely on any written product when presenting his expert opinion. Similarly, in *District of Columbia v. Carmichael*, 577 A.2d 312 (D.C. 1990), the expert did not "identify any concrete standard upon which a finding of negligence could be based." *Id.* at 315. In contrast, Mr. Bradley's testimony was much more than a simple assertion of "what he … would do under similar circumstances." *Messina*, 663 A.2d at 538 (quoting *Toy*, 549 A.2d at 7). Hence, the District of Columbia's sufficiency challenge fails.

**B. Substitute Expert Witness.** The district court granted Terry Butera's motion to strike as a witness Detective Johnny St. Valentine Brown, the expert whose testimony the District of Columbia and the officers planned to present, for two reasons. First, there was evidence indicating that the attorney for the District of Columbia, rather than Detective Brown, wrote his expert witness report, in possible violation of Fed.R.Civ.P. 26(a)(2)(B).[30] Second, Detective Brown had falsified his educational credentials during his deposition. Although the June 4, 1999 deadline for designating new experts had passed, the District of Columbia moved orally during a July 7, 1999 pretrial conference, and then in writing on July 28, 1999, for leave to replace the stricken expert witness. Noting "surprise[]" that Detective Brown "may have misrepresented his credentials," the District of Columbia argued that it would be "incurably prejudiced if [it] were denied the opportunity to present expert testimony regarding the applicable standards of care." Moreover, the District of Columbia argued that Terry Butera would not be prejudiced if the court allowed a substitute expert, because the district court had continued the trial date from July 26 to October 5 in response to Terry Butera's July 20, 1998 motion for a default judgment or continuance as a result of an allegedly "crucial" document that was not turned over during discovery.

■ The district court denied the District of Columbia's motion. It concluded that first, the named expert had misrepre-

---

30. Rule 26(a)(2)(B) provides in relevant part: Except as otherwise stipulated or directed by the court, [the disclosure of expert testimony] shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case …, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.
Fed.R.Civ.P. 26(a)(2)(B).

sented his qualifications; second, the "District of Columbia probably should have been aware of its own employee's educational background;" and third, while under Rule 26(a)(2)(B) an attorney may "assist" in the preparation of an expert's report, the actual preparation of the report goes "beyond mere assistance." We review the district court's preclusion of expert testimony for abuse of discretion. *See United States v. Hall,* 969 F.2d 1102, 1110 (D.C.Cir.1992). "Even if we find error, we will not reverse an otherwise valid judgment unless [the District of Columbia] demonstrates that such error affected [its] 'substantial rights.' " *Whitbeck v. Vital Signs, Inc.,* 159 F.3d 1369, 1372 (D.C.Cir.1998) (citation omitted).

In evaluating the district court's preclusion of expert testimony for the District of Columbia, our decisions addressing Fed. R.Civ.P. 37 are instructive.[31] The court has noted that "[a] district court may order sanctions, including a default judgment, for misconduct either pursuant to Rule 37(b)(2) ... or pursuant to the court's inherent power to 'protect [its] integrity and prevent abuses of the judicial process.' " *Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C.Cir.1998) (quoting *Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1474 (D.C.Cir.1995)). These preclusionary orders ensure that a party will not be able to profit from its own failure to comply with the rules set forth by the court. *See, e.g., Dellums v. Powell,* 566 F.2d 231, 235 (D.C.Cir.1977). Where the failure to comply is not due to willful bad faith or fault of the disobedient party, however, the harshest sanction of dismissal of the action, or preclusion of evidence, which is tantamount to dismissal, is inappropriate. *See Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958);

*Bonds v. District of Columbia,* 93 F.3d 801, 808–10 (D.C.Cir.1996).

The court has identified three justifications for the imposition of defaults or dismissals as sanctions for misconduct: (1) prejudice to the other party, (2) prejudice to the judicial system requiring the district court "to modify its own docket and operations to accommodate the delay," and (3) the need "to sanction conduct that is disrespectful to the court and to deter similar conduct in the future." *Webb,* 146 F.3d at 971 (quoting *Shea v. Donohoe Constr. Co.,* 795 F.2d 1071, 1074–77 (D.C.Cir.1986)); *see also Bonds,* 93 F.3d at 808; *Weiner v. Kneller,* 557 A.2d 1306, 1311–12 (D.C. 1989). Because Terry Butera does not identify how she would have been prejudiced by a substitute expert witness, and the district court had already continued the trial date for three months, we focus on the third justification.

Regarding the need for a sanction, the district court faced competing considerations. On one hand, the district court was confronted with perjury by the District of Columbia's named expert, a perceived violation of Rule 26 by the District of Columbia's attorney, and an untimely motion by the District of Columbia. The district court was clearly troubled by the misconduct of the attorney in writing the entirety of Detective Brown's report, which the court considered a violation of Rule 26, and which the District of Columbia does not contest on appeal. In addition, the District of Columbia's motion, which did not identify the substitute witness or set forth in detail the nature of his testimony, was untimely. Under these circumstances, the district court would have broad discretion to exclude the substituted testimony. *See Pride v. BIC Corporation,* 218 F.3d 566, 578–79 (6th Cir.2000). The

---

**31.** Rule 37 provides in relevant part:

(b)(2) Sanctions by Court in Which Action is Pending.

If a party ... fails to obey an order to provide or permit discovery ... or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just. ...

Fed.R.Civ.P. 37(b)(2).

district court could understandably have been reluctant to reward the District of Columbia for Detective Brown's perjury. On the other hand, the District of Columbia was apparently caught unaware, particularly as Detective Brown had been an expert witness for the United States in criminal prosecutions for many years. *See, e.g., United States v. Toms,* 136 F.3d 176, 184 (D.C.Cir.1998); *Hall,* 969 F.2d at 1109. Expert testimony was important in this case, *see Toy,* 549 A.2d at 8, and the absence of an expert witness for the District of Columbia could have rendered the trial imbalanced.

In some cases, the preclusion of expert testimony would be tantamount to a default judgment, and thus constitute an abuse of discretion. *See Bonds,* 93 F.3d at 808–09. But this is not such a case. In assessing the prejudice to the District of Columbia as a result of the preclusion of expert testimony on police practices, the court is confronted with the District of Columbia's trial admissions, which are devastating. The District of Columbia admitted to the jury that it failed (1) to take all possible precautions to ensure Eric Butera's safety; (2) to equip Eric Butera with surveillance or signaling devices; (3) to seek the assistance of other MPD units or special divisions in conducting the undercover operation; and (4) to inform Eric Butera of the potential risk of harm. It further admitted that the MPD assured Eric Butera that if he agreed to assist the MPD by playing an undercover role, the MPD would protect him from harm, would carefully watch and monitor him throughout the process, and would be standing closely by with sufficient resources to ensure his safety. In addition, there was abundant testimony indicating that the undercover operation was seriously flawed, starting with the admitted failure of the officers to conduct a comprehensive evaluation of the need to involve a citizen in an undercover operation, as required by MPD policy. Moreover, MPD General Orders and policies outlining the use of informants were in evidence. Consequently, it seems extremely doubtful that an expert for the District of Columbia on police practices would have mitigated the prejudice arising from the incriminating evidence that was before the jury. Nothing that the District of Columbia contends on appeal suggests to the contrary.

Accordingly, we affirm the district court's denial of judgment as a matter of law on Terry Butera's statutory claims and on the punitive damages awards against the individual officers. We reverse the denial of summary judgment on Eric and Terry Butera's constitutional tort claims, and on the punitive damages award against the District of Columbia.